THE CHICAGO & NORTHWESTERN RAILWAY COMPANY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* EDWARD HEMPSTEAD *et al.*

1. RAILROADS — *what constitutes the line of a railroad, for purposes of delivery of freight.* In a proceeding, by mandamus, to compel a railroad company to deliver at the elevator or grain warehouse of the relator, in the

city of Chicago, whatever grain in bulk might be consigned to it upon the line of their road, it appeared the company entered the city from different points upon separate tracks, these separate tracks or lines of road being called divisions. The elevator was situated upon a track used by the company in connection with the business of one of those divisions exclusively, but could be reached from the other division, though by a very indirect route, and subjecting the company to great loss of time and pecuniary damage in the delay that would be caused to their regular trains and business on the latter division. It was *held,* the roads constituting these different divisions, though belonging to the same corporation, and having a common name, were, for the purposes of transportation, substantially different roads, constructed under different charters, and the track upon which the elevator in question was situated, having been laid for the convenience especially of one of those divisions, and only approachable from the other under the difficulties mentioned, it could not be regarded that the elevator was upon the line of the latter division in any such sense as to make it obligatory upon the company to deliver thereat freight coming over that division.

2.   But the track upon which the elevator in question was situated was owned and used by the respondent company and another company in common, and was a direct continuation of the line of one of the respondent company's divisions, and of easy and convenient access from that division, and was used by the respondent, not only to deliver grain to other elevators thereon, some of which were more difficult of access than that of the relator, but also to deliver lumber and other freight coming over such division, thus making it not only legally, but actually, by positive occupation, a part of their road. So it was *held,* that in reference to grain coming over that division, the track upon which the relator's elevator was situated was to be regarded as a part of the respondent's line of road, and it was their duty to deliver such grain to that elevator, if consigned to it.

3.   SAME — *of reasons for refusing to deliver grain in bulk to any elevator to which it is consigned.* Where grain in bulk is consigned to a particular elevator on the line of a railroad, it is no sufficient excuse for the company to refuse so to deliver it, that it can not do so without large additional expense caused by the loss of the use of motive power, labor of servants, and loss of use of cars while the same are being delivered and unloaded at such elevator, and brought back, for it is precisely that expense for which the company is paid its freight.

4.   SAME — *of injurious discriminations in the delivery of freight, by means of contracts.* Railway companies are common carriers, and, as such, they owe important duties to the public, from which they can not release themselves, except with the consent of every person who may call upon them to perform them. Among these duties is the obligation to receive and carry goods for all persons alike, without injurious discrimination as to

terms, and to deliver them in safety to the consignee, unless prevented by the act of God or the public enemy.

5. So where a railroad company set up as a defense, in a proceeding by mandamus, to compel them to deliver to the elevator or grain warehouse of the relator, whatever grain in bulk might be consigned to it upon the line of its road, that they had entered into contracts with the owners of certain other elevators at the same point for exclusive delivery to the latter to the extent of their capacity, it was *held*, such contracts could have no effect when set up against a person not a party to them, as an excuse for not performing toward such person those duties of a common carrier prescribed by law.

6. SAME — *right of a railroad company to prescribe their mode of carriage and delivery by their own usage or rules.* A railroad company can establish no custom inconsistent with the spirit and object of its charter. It can make such rules and contracts as it pleases, not inconsistent with its duties as a common carrier, and any general language used in its charter in respect to its powers, in that regard, must be construed with that limitation.

7. So where a railroad company sought to evade the receiving, and delivery of grain in bulk to a particular elevator, to which it was consigned, on the ground that it had the right to establish its own usage in that regard, and it never having held itself out as a carrier of grain in bulk, except upon the condition that it might itself choose the consignee, this had become the custom and usage of its business, and it could not be required to go beyond this limit, it was *held*, the company could make no such injurious or arbitrary discrimination between individuals in its dealings with the public.

8. MANDAMUS — *when the proper remedy.* The writ of mandamus is the proper remedy to compel a railroad company to deliver to a particular elevator whatever grain in bulk may be consigned to it upon the line of its road.

APPEAL from the Superior Court of Chicago.

The opinion states the case.

Mr. JAMES H. HOWE, for the appellant.

The relations between common carriers and those who employ them are those of contract, either expressed, or implied from their acts; Angell on Carriers, 64; *Noyes* v. *R. R. Co.*, 27 Vt. 110; *Hales* v. *L. N. W. R. Co.*, 4 Bestsmith, 66 (E. C. L. R. 116); *Johnson* v. *The M. R. R. Co.*, 4 Exc. 367; *N. J. Steam Nav. Co.* v. *Merchants' Bank of Boston*, 6 How. 344;

*M. C. R. Co.* v. *Read*, 37 Ill. 484; *The West. T. Co.* v. *Newhall*, 24 id. 466.

The law imposes what it calls a "duty" upon common carriers, but this duty arises only from contracts the carrier makes, or from the agreements he holds himself out to the world as ready to make. This court, in the case of the *Western Transportation Co.* v. *Newhall*, 24 Ill. 468, define this duty very clearly.

The duty of a common carrier to deliver, in the absence of an express contract, in accordance with the usage and course of his business, was very fully considered by the supreme court of Vermont in the case of *The Farmers and Mechanics' Bank* v. *The Transportation Co.*, 23 Vt. 186. See, also, *Richards* v. *Mich. South. & North. Indiana Railroad Co.*, 20 Ill. 404; *Porter* v. *Chicago & Rock Island Railroad Co.*, id. 407; 2 Redfield on Railways, § 51; *Thomas* v. *Railroad*, 10 Metc. 472; *Moses* v. *Railroad*, 32 N. H. 523; *Norwood Plains Co.* v. *Railroad*, 1 Gray, 263.

It is submitted to the court that these cases, with many similar ones that might be cited, establish, beyond cavil, these propositions:

I. That the relations existing between common carriers and those who employ them are founded upon contracts.

II. That a carrier has the right to establish his own course and manner of doing his business, and that when established the law imposes a duty upon him to do business for all who seek to employ him, to the extent of his capacity, in the course and manner which he has adopted.

III. That he can make express contracts with persons, changing his usual and ordinary mode of doing business, either by enlarging or restricting his responsibilities.

IV. That the usual and ordinary methods of business of a common carrier by railroad, only impose upon it the duty of delivering property at its own depot.

V. That an action will lie against a carrier for refusing to receive and transport property, having the ability to do it,

within the scope of its usual and ordinary business, but that such action will not lie for a refusal to receive and transport in a manner different from that usual and ordinary course of business.

Mandamus is not the proper remedy.   3 Stephen's N. P. 2,291 ; Moses on Mandamus, 18 ; *Lamar* v. *Marshall*, 21 Ala. 772; *Fears* v. *Munn*, 2 N. J. 161; *Roberts* v. *Addsed*, 16 Pet. 216 ; *Davenport, ex parte*, 6 id. 661 ; *Gray* v. *Bridge*, 11 id. 189 ; *Ex parte Bailey*, 2 Cow. 479 ; *Ex parte Bacon*, 6 id. 392; *The People* v. *The Contract Board*, 27 N. Y. 378; *The People* v. *Canal Boat*, 13 Barb. 432.

Messrs. GOUDY & CHANDLER, for the appellees.

It is the legal duty of the appellant to do the acts commanded by the alternative writ, both by the common law and statute.   *Vincent* v. *C. & A. R. R. Co.*, 49 Ill. 33 ; Laws 1867, 181, § 22.   The appellant is a common carrier, and as such must carry for all, and all goods, without discrimination. *Chicago and Aurora Railroad* v. *Thompson*, 19 Ill. 584; *Ill. Central Railroad* v. *Morrison*, id. 139 ; *Western Transportation Co.* v. *Newhall*, 24 Ill. 466; Redfield on Com. Carriers, 15, 27.   The duty of common carriers is one of law, growing out of their office, and not of contract ; and the liability can not be limited, except by a contract assented to by the employer. Redfield on Carriers, 30, § 40 ; *Western Transportation Co.* v. *Newhall*, 24 Ill. 466.

There is no exemption from the common law duty, by the charters of the appellant.   By these it became a carrier of all kinds of freight, and, while it could make rules consistent with its duties enjoined by law, it could make none inconsistent with such law.   While the railroad company might, by special contract, limit its duties and liabilities, touching the property of the contracting party, it could not agree with another party not to carry for all, or not to deliver to the consignee.

The remedy by mandamus is an appropriate one.   The duty

24 —56TH ILL.

is of a public character, and there is no other adequate mode of relief.   *Vincent* v. *C. & A. R. R.*, 49 Ill. 33.

The railroad company will be compelled by mandamus to perform its corporate duties, and to receive and deliver goods as directed.

"No better general rule can be laid down on this subject, than that where the charter of a corporation, or the general statute in force, and applicable to the subject, imposes a specific duty, either in terms or by fair or reasonable construction and implication, and there is no other specific and adequate remedy, the writ of mandamus will be awarded."   2 Redf. on Railways, 279.

A mandamus has been awarded to compel a railroad company to run its cars to a particular point, and there to receive and discharge passengers.   *State* v. *Hartford & N. H. R. R. Co.*, 29 Conn. 538; *People* v. *The Albany & Vt. R.*, 24 N. Y. 627.

A mandamus was applied for to compel a railroad company to receive the goods of the relator, and only refused upon the ground that the company was not, by its charter and custom, a carrier of that kind of goods.   *Ex parte Robbins*, 7 Dowl. P. C. 566; 2 Shelf. on Railways, 846.

The law is discussed, and many cases referred to in Moses on Mandamus, 155, 168, 171, 176, and 2 Redf. on Railroads, 257, 275, 294.

Mr. JOHN N. JEWETT, for the appellants, in reply, contended that mandamus is not the appropriate remedy in this case, citing Tappan on Mand. 57, 64, 65, 69, 72; *People* v. *Corporation of Brooklyn*, 1 Wend. 318; *People* v. *Mayor of N. Y.*, 10 id. 393; *Boyce* v. *Russell*, 2 Cow. 444; *Chase* v. *The Blackstone Canal Co.*, 10 Pick. 244; *City of Ottawa* v. *The People*, 48 Ill. 234.

Counsel argued in support of the following propositions:

1. That at common law, a common carrier was one who undertook, or held himself out as ready to undertake, the

carriage of goods, as an occupation, for all persons indifferently, by the means and upon the routes adopted by himself.

2. That, having entered upon this employment, he was bound by law to receive and carry goods suited to his means of transportation, for all people without discrimination or preference.

3. That the manner and place of delivery at the end of the route was a matter within his own discretion, in the first instance; the only requirement of the law in this respect being, that, when established, it should be uniformly and consistently adhered to.

4. That neither the public nor individuals have any legal right to demand of the common carrier the assumption of any duties or obligations, other than, or different from, those which he has assumed by the custom and usages of his business.

5. That a person may be a common carrier, without importing that he has undertaken to do, and without being under obligation to do, *every thing* which a common carrier might do.

6. That railroad companies, as common carriers, have precisely the same rights of judgment as individual carriers, with the exception, that their routes are fixed, and their means of transportation, generally, determined by the charter creating them.

7. That whether they shall adopt the custom of delivery at the residence or place of business of the consignee, and thereby place themselves under obligations to do so, or not, is a matter of discretion to be determined by themselves, and is, by no means, dependent upon their ability or inability to reach such places with the cars employed by them for transportation from place to place.

8. That, if the law demanded of them such delivery, they would, of necessity, have an implied authority to use the means requisite to make such delivery, and that they might therefrom be required to deliver by wagons, at places which could not be reached by their cars.

9. That the obligations of a carrier, corporate or individual, in respect to the carriage and delivery of goods actually

received for carriage, are regulated by contract, express or implied; and, in the absence of an express contract, the law implies only an agreement or undertaking to carry and deliver according to the custom and usages of his business.

10. That, having established the custom and usages of his business, the common carrier may be compelled (if mandamus is a proper remedy) to carry and deliver in accordance with that custom and usage but not otherwise. The reason is, that the custom and usage being valid, fix the limit of his legal duty in this particular, and the right to demand a service can not be broader than the obligation to perform it.

11. That the object and aim of these proceedings is to compel the appellant to depart from the well established custom and usages of its business, and to make a special contract for the delivery of grain, at a particular place, contrary to such custom and usages.

12. That no duty or obligation to make such a contract is imposed upon the appellant as a common carrier, either by the common law or by statute, and, therefore, the alternative writ is defective in substance, and should have been quashed — notwithstanding the averment of legal duty contained in it.

Mr. CHIEF JUSTICE LAWRENCE delivered the opinion of the Court :

This was an application for a mandamus, on the relation of the owners of the Illinois River elevator, a grain warehouse in the city of Chicago, against the Chicago and Northwestern Railroad Company. The relators seek by the writ to compel the railway company to deliver to said elevator whatever grain in bulk may be consigned to it upon the line of its road. There was a return duly made to the alternative writ, a demurrer to the return, and a judgment *pro forma* upon the demurrer, directing the issuing of a peremptory writ. From that judgment the railway company has prosecuted an appeal.

The facts as presented by the record are briefly as follows :

The company has freight and passenger depots on the west side of the north branch of the Chicago river, north of Kinzie street, for the use, as we understand the record and the maps which are made a part thereof, of the divisions known as the Wisconsin and Milwaukie divisions of the road, running in a north-westerly direction. It also has depots on the east side of the north branch, for the use of the Galena division, running westerly. It has also a depot on the south branch near Sixteenth street, which it reaches by a track diverging from the Galena line on the west side of the city. The map indicates a line running north from Sixteenth street the entire length of West Water street, but we do not understand the relators to claim their elevator should be approached by this line, as the respondent has no interest in this line south of Van Buren street.

Under an ordinance of the city, passed August 10, 1858, the Pittsburgh, Fort Wayne and Chicago company, and the Chicago, St. Paul and Fond Du Lac company (now merged in the Chicago and Northwestern company) constructed a track on West Water street, from Van Buren street north to Kinzie street, for the purpose of forming a connection between the two roads. The Pittsburgh, Fort Wayne and Chicago company laid the track from Van Buren to Randolph street, and the Chicago, St. Paul and Fond Du Lac company, that portion of the track from Randolph north to its own depot. These different portions of the track were, however, constructed by these two companies, by an arrangement between themselves, the precise character of which does not appear, but it is to be inferred from the record that they have a common right to the use of the track from Van Buren street to Kinzie, and do in fact use it in common. The elevator of the relators is situated south of Randolph street, and north of Van Buren, and is connected with the main track by a side track laid by the Pittsburgh company, at the request and expense of the owners of the elevator, and connected at each end with the main track.

Since the 10th of August, 1866, the Chicago and North-western Company, in consequence of certain arrangements and agreements on and before that day entered into between the company and the owners of certain elevators known as the Galena, Northwestern, Munn & Scott, Union, City, Munger and Armor, and Wheeler, has refused to deliver grain in bulk to any elevator except those above named. There is also in force a rule of the company, adopted in 1864, forbidding the carriage of grain in bulk if consigned to any particular elevator in Chicago, thus reserving to itself the selection of the warehouse to which the grain should be delivered. The rule also provides that grain in bags shall be charged an additional price for transportation. This rule is still in force.

The situation of these elevators, to which alone the company will deliver grain, is as follows: The Northwestern is situated near the depot of the Wisconsin division of the road, north of Kinzie street; the Munn & Scott on West Water street, between the elevator of relators and Kinzie street; the Union and City near Sixteenth street, and approached only by the track diverging from the Galena division, on the west side of the city, already mentioned; and the others are on the east side of the north branch of the Chicago river. The Munn & Scott elevator can be reached only by the line laid on West Water street under the city ordinance already mentioned; and the elevator of relators is reached in the same way, being about four and a half blocks further south. The line of the Galena division of the road crosses the line on West Water street at nearly a right angle, and thence crosses the North Branch on a bridge. It appears by the return to the writ, that a car coming into Chicago on the Galena division, in order to reach the elevator of relators, would have to be taken by a drawbridge across the river on a single track, over which the great mass of the business of the Galena division is done, then backed across the river again upon what is known as the Milwaukie division of respondent's road, thence taken to the track on West Water street, and the cars, when unloaded, could only be taken back

to the Galena division by a similar, but reversed, process, thus necessitating the passage of the drawbridge, with only a single line, four times, and, as averred in the return, subjecting the company to great loss of time and pecuniary damage in the delay that would be caused to its regular trains and business on that division.

This seems so apparent that it can not be fairly claimed the elevator of relators is upon the line of the Galena division, in any such sense as to make it obligatory upon the company to deliver upon West Water street freight coming over that division of the road. The doctrine of the Vincent Case, in 49 Ill., was, that a railway company must deliver grain to any elevator which it had allowed, by a switch, to be connected with its own line. This rule has been re-affirmed in an opinion filed at the present term, in the case of *The People ex rel. Hempstead v. The Chi. & Alton R. R. Company*, 55 Ill. 95, but in the last case we have also held that a railway company can not be compelled to deliver beyond its own line simply because there are connecting tracks over which it might pass by paying track service, but which it has never made a part of its own line by use.

So far as we can judge from this record, and the maps showing the railway lines and connections, filed as a part thereof, the Wisconsin and Milwaukie divisions, running north-west, and the Galena division, running west, though belonging to the same corporation and having a common name, are, for the purposes of transportation, substantially different roads, constructed under different charters, and the track on West Water street seems to have been laid for the convenience of the Wisconsin and Milwaukie divisions. It would be a harsh and unreasonable application of the rule announced in the Vincent case, and a great extension of the rule beyond any thing said in that case, if we were to hold that these relators could compel the company to deliver at their elevator grain which has been transported over the Galena division, merely because the delivery is physically possible, though causing great expense to

the company and a great derangement of its general business, and though the track on West Water street is not used by the company in connection with the business of the Galena division.

What we have said disposes of the case so far as relates to the delivery of grain coming over the Galena division of respondent's road. As to such grain the mandamus should not have been awarded.

When, however, we examine the record as to the connection between the relators' elevator, and the Wisconsin and Milwaukie divisions of respondent's road, we find a very different state of facts. The track on West Water street is a direct continuation of the line of the Wisconsin and Milwaukie division; cars coming on this track from these divisions do not cross the river. The Munn & Scott elevator, to which the respondent delivers grain, is, as already stated, upon a side track connected with this track. The respondent not only uses this track to deliver grain to the Munn & Scott elevator, but it also delivers lumber and other freight upon this track, thus making it not only legally, but actually, by positive occupation, a part of its road. The respondent, in its return, admits in explicit terms, that it has an equal interest with the Pittsburg, Fort Wayne and Chicago railroad in the track laid in West Water street. It also admits its use, and the only allegation made in the return for the purpose of showing any difficulty in delivering to relators' elevator, the grain consigned thereto from the Wisconsin and Milwaukie divisions, is, that those divisions connect with the line on West Water street only by a single track, and that respondent can not deliver bulk grain or other freight to the elevator of relators, even from those divisions, without large additional expense, caused by the loss of the use of motive power, labor of servants, and loss of use of cars, while the same are being delivered and unloaded at said elevator and brought back. As a reason for non-delivery on the ground of difficulty, this is simply frivolous. The expense caused by the loss of the use of motive power, labor and cars, while the latter are being taken to their place of destination and unloaded, is precisely

the expense for which the company is paid its freight.  It has constructed this line on West Water street, in order to do the very work which it now, in general terms, pronounces a source of large additional expense; yet it does not find the alleged additional expense an obstacle in the way of delivering grain upon this track at the warehouse of Munn & Scott, or delivering other freights to other persons than the relators. Indeed it seems evident, from the diagrams attached to the record, that three of the elevators, to which the respondent delivers grain, are more difficult of access than that of the relators, and three of the others have no appreciable advantage in that respect, if not placed at a decided disadvantage, by the fact that they can be reached only by crossing the river.

We presume, however, from the argument, that the respondent's counsel place no reliance upon this allegation of additional expense, so far as the Wisconsin and Milwaukie divisions are concerned.  They rest the defense on the contracts made between the company and the elevators above named, for exclusive delivery to the latter, to the extent of their capacity. This brings us to the most important question in the case.  Is a contract of this character a valid excuse to the company for refusing to deliver grain to an elevator, upon its lines and not a party to the contract, to which such grain has been consigned?

In the oral argument of this case it was claimed, by counsel for the respondent, that a railway company was a mere private corporation, and that it was the right and duty of its directors to conduct its business merely with reference to the pecuniary interests of the stockholders.  The printed arguments do not go to this extent, in terms, but they are colored throughout by the same idea, and in one of them we find counsel applying to the supreme court of the United States, and the supreme court of Pennsylvania, language of severe, and almost contemptuous, disparagement, because those tribunals have said, that " a common carrier is in the exercise of a sort of public office."  *N. J. Steam Nav. Co.* v. *Merch. Bank,* 6 How. 381; *Sanford* v. *Railroad Co.,* 24 Penn. 380.  If the language is not critically

accurate, perhaps we can pardon these courts, when we find that substantially the same language was used by Lord Holt, in *Coggs* v. *Bernard*, 2 Lord Raymond, 909, the leading case in all our books on the subject of bailments.   The language of that case is, that the common carrier " exercises a public employment."

We shall engage in no discussion in regard to names.   It is immaterial whether or not these corporations can be properly said to be in the exercise of " a sort of public office," or whether they are to be styled private, or *quasi* public •corporations. Certain it is, that they owe some important duties to the public, and it only concerns us now to ascertain the extent of these duties as regards the case made upon this record.

It is admitted by respondent's counsel, that railway companies are common carriers, though even that admission is somewhat grudgingly made.   Regarded merely as a common carrier at common law, and independently of any obligations imposed by the acceptance of its charter, it would owe important duties to the public, from which it could not release itself, except with the consent of every person who might call upon it to perform them.   Among these duties, as well defined and settled as any thing in the law, was the obligation to receive and carry goods for all persons alike, without injurious discrimination as to terms, and to deliver them in safety to the consignee, unless prevented by the act of God or the public enemy.   These obligations grew out of the relation voluntarily assumed by the carrier toward the public, and the requirements of public policy, and so important have they been deemed, that eminent judges have often expressed their regret that common carriers have ever been permitted to vary their common law liability, even by a special contract with the owner of the goods.

Regarded, then, merely as a common carrier at common law, the respondent should not be permitted to say it will deliver goods at the warehouse of A and B, but will not deliver at the warehouse of C, the latter presenting equal facilities for

the discharge of freight, and being accessible on respondent's line.

But railway companies may well be regarded as under a higher obligation, if that were possible, than that imposed by the common law, to discharge their duties to the public as common carriers fairly and impartially. As has been said by other courts, the State has endowed them with something of its own sovereignty, in giving them the right of eminent domain. By virtue of this power, they take the lands of the citizen against his will and can, if need be, demolish his house. Is it supposed these great powers were granted merely for the private gain of the corporators? On the contrary, we all know the companies were created for the public good.

The object of the legislature was to add to the means of travel and commerce. If, then, a common carrier at common law came under obligations to the public from which he could not discharge himself at his own volition, still less should a railway company be permitted to do so, when it was created for the public benefit and has received from the public such extraordinary privileges. Railway charters not only give a perpetual existence and great power, but they have been constantly recognized by the courts of this country as contracts between the companies and the State, imposing reciprocal obligations. The courts have always been, and we trust always will be, ready to protect these companies in their chartered rights, but, on the other hand, we should be equally ready to insist that they perform faithfully to the public those duties which were the object of their chartered powers.

We are not, of course, to be understood as saying or intimating, that the legislature, or the courts, may require from a railway company the performance of any and all acts that might redound to the public benefit, without reference to the pecuniary welfare of the company itself. We hold simply that it must perform all those duties of a common carrier to which it knew it would be liable when it sought and obtained its charter, and the fact that the public has bestowed upon it extraordinary

powers is but an additional reason for holding it to a complete performance of its obligations.

The duty sought to be enforced in this proceeding, is the delivery of grain in bulk to the warehouse to which it is consigned, such warehouse being on the line of the respondent's road, with facilities for its delivery equal to those of the other warehouses at which the company does deliver, and the carriage of grain in bulk being a part of its regular business. This, then, is the precise question decided in the Vincent Case, in 49 Ill., and it is unnecessary to repeat what was there said. We may remark, however, that, as the argument of counsel necessarily brought that case under review, and as it was decided before the re-organization of this court under the new constitution, the court as now constituted has re-examined that decision, and fully concurs therein. That case is really decisive of the present, so far as respects grain transported on the Wisconsin and Milwaukie divisions of respondent's road. The only difference between this and the Vincent Case is, in the existence of the contract for exclusive delivery to the favored warehouses, and this contract can have no effect when set up against a person not a party to it, as an excuse for not performing toward such person those duties of a common carrier prescribed by the common law, and declared by the statute of the State.

The contract in question is peculiarly objectionable in its character and peculiarly defiant of the obligations of the respondent to the public as a common carrier. If the principle implied in it were conceded, the railway companies of the State might make similar contracts with individuals at every important point upon their lines, and in regard to other articles of commerce besides grain, and thus subject the business of the State almost wholly to their control, as a means of their own emolument. Instead of making a contract with several elevators, as in the present case, each road that enters Chicago might contract with one alone, and thus give to the owner of such elevator an absolute and complete monopoly in

the handling of all the grain that might be transported over such road. So too, at every important town in the interior, each road might contract that all the lumber carried by it should be consigned to a particular yard. How injurious to the public would be the creation of such a system of organized monopolies in the most important articles of commerce, claiming existence under a perpetual charter from the State, and, by the sacredness of such charter, claiming also to set the legislative will itself at defiance, it is hardly worth while to speculate. It would be difficult to exaggerate the evil of which such a system would be the cause, when fully developed, and managed by unscrupulous hands.

Can it be seriously doubted whether a contract, involving such a principle, and such results, is in conflict with the duties which the company owes to the public as a common carrier? The fact that a contract has been made is really of no moment, because, if the company can bind the public by a contract of this sort, it can do the same thing by a mere regulation of its own, and say to these relators that it will not deliver at their warehouse the grain consigned to them, because it prefers to deliver it elsewhere. The contract, if vicious in itself, so far from excusing the road, only shows that the policy of delivering grain exclusively at its chosen warehouses, is a deliberate policy, to be followed for a term of years, during which these contracts run.

It is, however, urged very strenuously by counsel for the respondent, that a common carrier, in the absence of contract, is bound to carry and deliver only according to the custom and usage of his business; that it depends upon himself to establish such custom and usage; and that the respondent, never having held itself out as a carrier of grain in bulk, except upon the condition that it may itself choose the consignee, this has become the custom and usage of its business, and it can not be required to go beyond this limit. In answer to this position, the fact that the respondent has derived its life and powers from the people, through the legislature, comes in with controlling

force.   Admit, if the respondent were a private association,
which had established a line of wagons, for the purpose of
carrying grain from the Wisconsin boundary to the elevator of
Munn & Scott in Chicago, and had never offered to carry or
deliver it elsewhere, that it could not be compelled to depart
from the custom or usage of its trade.   Still the admission does
not aid the respondent in this case.   In the case supposed, the
carrier would establish the terminal points of his route at his
own discretion, and could change them as his interests might
demand.   He offers himself to the public only as a common
carrier to that extent, and he can abandon his first line and
adopt another at his own volition.   If he should abandon it,
and, instead of offering to carry grain only to the elevator of
Munn & Scott, should offer to carry it generally to Chicago,
then he would clearly be obliged to deliver it to any consignee
in Chicago, to whom it might be sent and to whom it could be
delivered, the place of delivery being upon his line of carriage.

In the case before us, admitting the position of counsel that
a common carrier establishes his own line and terminal points,
the question arises, at what time and how does a railway com-
pany establish them?   We answer, when it accepts from the
legislature the charter which gives it life, and by virtue of such
acceptance.   That is the point of time at which its obligations
begin.   It is then that it holds itself out to the world as a com-
mon carrier, whose business will begin as soon as the road is
constructed upon the line which the charter has fixed.   Sup-
pose this respondent had asked from the legislature a char-
ter authorizing it to carry grain in bulk to be delivered
only at the elevator of Munn & Scott, and no where else in the
city of Chicago.   Can any one suppose such charter would have
been granted?   The supposition is preposterous.   But, instead
of a charter making a particular elevator the terminus and
place of delivery, the legislature granted one which made the
city of Chicago itself the terminus, and when this charter was
accepted there at once arose, on the part of the respondent, the
corresponding obligation to deliver grain at any point within the

city of Chicago, upon its lines, with suitable accommodations for receiving it, to which such grain might be consigned. Perhaps grain in bulk was not then carried in cars, and elevators may not have been largely introduced. But the charter was granted to promote the conveniences of commerce, and it is the constant duty of the respondent to adapt its agencies to that end. When these elevators were erected in Chicago, to which the respondent's line extended, it could only carry out the obligations of its charter by receiving and delivering to each elevator whatever grain might be consigned to it, and it is idle to say such obligation can be evaded by the claim that such delivery has not been the custom or usage of respondent. It can be permitted to establish no custom inconsistent with the spirit and object of its charter.

It is claimed by counsel that the charter of respondent authorizes it to make such contracts and regulations as might be necessary in the transaction of its business. But certainly we can not suppose the legislature intended to authorize the making of such rules or contracts as would defeat the very object it had in view in granting the charter. The company can make such rules and contracts as it pleases, not inconsistent with its duties as a common carrier, but it can go no further, and any general language which its charter may contain must necessarily be construed with that limitation. In the case cf *The City of Chicago* v. *Rumpff*, 45 Ill. 94, this court held a clause in the charter, giving the common council the right to control and regulate the business of slaughtering animals, did not authorize the city to create a monopoly of the business, under pretense of regulating and controlling it.

It is unnecessary to speak particularly of the rule adopted by the company in reference to the transportation of grain. What we have said in regard to the contract applies equally to the rule.

The principle that a railroad company can make no injurious or arbitrary discrimination between individuals in its dealings with the public, not only commends itself to our reason and

sense of justice, but is sustained by adjudged cases. In England, a contract which admitted to the door of a station, within the yard of a railway company, a certain omnibus, and excluded another omnibus, was held void. *Marriot* v. *L. & S. W. R. R. Co.*, 87 Eng. Com. Law, 498.

In *Gaston* v. *Bristol & Exeter Railroad Company*, 95 Eng. Com. Law, 641, it was held, that a contract with certain ironmongers, to carry their freight for a less price than that charged the public, was illegal, no good reason for the discrimination being shown.

In *Crouch* v. *The L. & N. W. R. Co.*, 78 Eng. Com. Law, 254, it was held, a railway company could not make a regulation for the conveyance of goods which, in practice, affected one individual only.

In *Sandford* v. *Railroad Company*, 24 Penn. 382, the court held, that the power given in the charter of a railway company to regulate the transportation of the road did not give the right to grant exclusive privileges to a particular express company. The court say, "If the company possessed this power, it might build up one set of men and destroy others; advance one kind of business and break down another, and make even religion and politics the tests in the distribution of its favors. The rights of the people are not subject to any such corporate control."

We refer also to *Rogers' Locomotive Works* v. *Erie R. R. Co.*, 5 Green, 380, and *State* v. *Hartford & N. H. R. Co.*, 29 Conn. 538.

It is insisted by counsel for the respondent that, even if the relators have just cause of complaint, they can not resort to the writ of mandamus. We are of opinion, however, that they can have an adequate remedy in no other way, and that the writ will therefore lie.

The judgment of the court below awarding a peremptory mandamus must be reversed, because it applies to the Galena division of respondent's road, as well as to the Wisconsin and Milwaukie divisions. If it had applied only to the latter,

we should have affirmed the judgment. The parties have stipulated that, in case of reversal, the case shall be remanded, with leave to the relators to traverse the return. We therefore make no final order, but remand the case, with leave to both parties to amend their pleadings, if desired, in view of what has been said in this opinion.

*Judgment reversed.*