THE PEOPLE OF THE STATE OF NEW YORK, Appellants, v. THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Respondent.

THE SAME v. NEW YORK, LAKE ERIE AND WESTERN RAILROAD COMPANY, Respondent.

28   543
72   368
28   543.
38ap415.
28h    543
69 A.D⁴557
69 A.D⁴558

*Mandamus — motion to quash, should not be entertained until after the writ has been issued — Who entitled to open the argument upon the hearing of a motion — when error in deciding the question is not reviewable at the General Term — Power of the State to compel a railroad corporation to discharge its duties by mandamus — A simple dispute between the company and its employes, as to the wages to be paid to the latter, does not excuse a failure by the company to discharge its duties to the public — as to the effect of an illegal combination of the employes — Form of the writ to be issued.*

Upon the return of an order requiring a railroad company to show cause why a peremptory writ of *mandamus* should not issue, commanding it to forthwith resume the discharge of its duties as a common carrier, it appeared by counsel; objected that the moving papers failed to show any grounds for the relief prayed for, and moved to quash and dismiss the petition and order to show cause. The court entertained the motion and, against the petitioners' objection, allowed the company's counsel to open and close the argument. It subsequently sustained the objection and granted the motion to quash.

*Held*, that the practice of the court in entertaining the motion to quash before any writ had been issued, and in allowing the company to open and close the argument, was irregular and should not be countenanced.

Although when a trial is had before a jury an error in awarding the right to open or close the case is fatal to the judgment, yet upon an appeal from an order made at a Special Term the court will only inquire as to the correctness of the order granting or denying the motion.

In an action brought by the people, by their attorney-general, a railroad corporation may be compelled by *mandamus* to exercise its duties as a carrier of freight and passengers.

The power to so compel it to act rests upon the ground:

1st. That the duty is a public trust, which, having been conferred by the State and accepted by the corporation, may be enforced for the public benefit.

2d. Upon the contract between the corporation and the State, expressed in its charter or implied by the acceptance of the franchise.

3d. Upon the ground that the common right of all the people to travel and carry upon every public highway of the State has been changed in this special instance by the legislature, for adequate reasons, into a corporate franchise, to be exercised solely by a corporate body, for the public benefit, to the exclusion of all other persons; whereby it has become the duty of the State to see to it that the franchise so put in trust be faithfully administered by the trustee.

Where such a corporation fails to use, or misuses, the public trust and function vested in it by the State, it rests in the sound discretion of the attorney-general to decide whether to apply for a *mandamus* or to have the charter of the corporation annulled.

The application for a *mandamus* cannot be defeated by showing that the State has not been injured by the refusal of the company to act, and that the individuals who have been injured have private remedies wherewith to recover the damages sustained

The provisions contained in section 28 of chapter 140 of 1850, as amended by chapter 133 of 1880, which authorized railroad companies " to regulate the time and manner in which passengers and property shall be transported," although conferring a certain discretion upon the company, do not justify a general or partial suspension of the duty of receiving and transporting freight.

The petition and affidavits presented to the court, upon an application for a *mandamus,* showed that, for about two weeks, the company had substantially refused to discharge its duties as a common carrier, and had, to a material degree, suspended the exercise of its franchises by refusing to take freight which had been offered to it at its stations in New York for transportation at the usual rates and upon the usual terms, whereby the people of the State of New York, and the trade and commerce of the city of New York, and many individuals therein, were greatly damaged and injured.

The only excuse alleged for the non-performance of its duties by the company was, in effect, that its skilled freight handlers, who had been working at the rate of seventeen cents per hour (or one dollar and seventy cents for ten hours), refused to work unless twenty cents per hour (or two dollars per day, of ten hours) was paid. It was not alleged that the workmen committed any unlawful act; and no violence, riot or unlawful interference with the other employes of the respondent was shown.

*Held,* that the excuse was insufficient, and that a *mandamus* should have been issued.

*It seems,* that if it had been shown that a " strike " of their skilled laborers had been caused or compelled by some illegal combination or organized body, which held unlawful control of their actions, and sought through them to enforce its will upon the respondent, and that the respondent in resisting such unlawful efforts had refused to obey unjust and illegal dictation; and had used all the means in its power to employ other men in sufficient numbers to do the work; and that the refusal and neglect complained of had grown out of such a state of facts, a very different case for the exercise of the discretion of the court, as well as of the attorney-general, would have been presented. (Per DAVIS, P. J.)

Where a peremptory writ is issued in such a case, it should require the company to exercise its franchises, and to receive and transport freight upon such terms as are reasonable and usual, and to perform its duties as a common carrier.

APPEALS from orders of the Special Term, granting motions to quash and dismiss the petitions and orders to show cause of the

appellants, and denying the application of the appellants for peremptory writs of *mandamus.*

Upon the facts set forth in the petition and accompanying affidavits, an order was made in each of the above entitled proceedings requiring the respondent to show cause " why a peremptory writ of *mandamus* to compel the said corporation to exercise its franchises, and to receive and transport freight upon such terms as are reasonable and usual, and to perform its duties as a common carrier " should not issue in each case.

*Leslie W. Russell,* attorney-general, and *E. C. James, Simon Sterne* and *Daniel G. Thompson,* for the appellants.

*W. D. Shipman* and *Roscoe Conkling,* for the respondents.

Davis, P. J.:

The appellants, upon the petition of their attorney-general, and affidavits accompanying the same, obtained orders from one of the justices of this court requiring the respondents, respectively, to show cause, upon service of less than eight days, at a Special Term sitting at chambers, why a peremptory writ of *mandamus* should not issue, commanding the respondents, respectively, to forthwith resume the discharge of their duties as common carriers, and the exercise of their franchise, by promptly receiving, transporting and delivering all such freight or other property as might be offered to or had been heretofore received by them for transportation at their stations, in and to the city of New York, upon the usual and reasonable terms and charges.

Upon an adjourned day for the hearing of the motions, the respondents appeared by counsel and objected that the moving papers failed to show any grounds for the relief prayed for ; and moved "to quash and dismiss said petitions and orders to show cause." The court entertained this motion, and, against the objection of the appellants, awarded the right to open and close the argument on the hearing to the counsel for the respondents ; and after hearing the respective counsel, the court in each case ordered as follows : " That the said preliminary objection be and the same is hereby sustained, and that the motion to quash the said petition and order to show cause be and the same is hereby granted, and the said application of the said petitioner denied."

It is now objected that this mode of disposing of the motions was so far irregular as to render the orders erroneous.

It certainly was an unusual mode of proceeding. The motions came to the Special Term precisely as though upon an ordinary notice. The order of the judge simply limited the time of notice; and when the respondents appeared in answer to the notice, if they were willing to come to a hearing upon the petition and affidavits, the usual and proper course was to proceed to a hearing of the motions upon those papers, the moving party holding the affirmative and being entitled to the right to open and close. A motion to quash a motion is a novel proceeding. Motions to quash usually apply to existing writs or process, and not to mere attempts to obtain them. The court doubtless regarded the action of the respondents' counsel as in the nature of a demurrer *ore tenus* to the petition and affidavits on the part of the appellants. Where an *alternative writ* has been granted, the defendant may move to quash or set the same aside. (*The People ex rel. Knapp* v. *The Judges, etc., of Westchester*, 4 Cow., 73.) And such a motion is in the nature of a demurrer (*The People ex rel. Barnet* v. *College of Physicians and Surgeons*, 7 How. Pr., 290) and should be made before the return to the writ, unless the motion to quash is based upon a defect in substance, in which case it may be taken advantage of at any time before a peremptory *mandamus* is awarded. (*Commercial Bank* v. *Canal Commissioners*, 10 Wend., 31; *The People* v. *Ransom*, 2 N. Y., 492.) Of course, upon such a motion, the moving party holds the affirmative, but that was not this case. In this case, no alternative writ having been issued, there was nothing to quash, and the objection made was simply an assertion that the appellants were not, upon their own showing, entitled to have the motion granted, and such assertion did not change the rights of the respective parties as to the order of proceeding on the hearing. The Court of Appeals have held that the according of the affirmative to the wrong party on a trial before a jury is an error fatal to the judgment. But on motions at Special Term, it is not very material which party opens or closes, and this court on review will only inquire into the correctness of the decisions where the order denies or grants the motion. In this case, although the order directs that the petition and proceedings be quashed, yet the motion for the

*mandamus* was also denied, and both the denial and the order to quash were based upon the merits of the motion. The right of appeal was not affected, and we think it is our duty to hear and dispose of the appeal upon the merits. The practice at the Special Term should, however, be discountenanced as a precedent.

The question presented by the motion is one of signal importance. It is whether the people of the State can invoke the power of the courts to compel the exercise by railroad corporations of the most useful public functions with which they are clothed. If the people have that right, there can be no doubt that their attorney-general is the proper officer to set it in effective operation on their behalf. (1 R. S., 179, § 1; Code of Civ. Proc., § 1993; *People* v. *Halsey*, 37 N. Y., 344; *People* v. *Collins*, 19 Wend., 56.)

The question involves a consideration of the nature of this class of corporations, the objects for which they are created, the powers conferred and the duties imposed upon them by the laws of their creation, and of the State. As bodies corporate, their ownership may be and usually is altogether private, belonging wholly to the holders of their capital stock; and their management may be vested in such officers or agents as the stockholders and directors under the provisions of law, may appoint. In this sense they are to be regarded as trading or private corporations, having in view the profit or advantages of the corporators. But these conditions are in no just sense in conflict with their obligations and duties to the public. The objects of their creation are from their very nature, largely different from those of ordinary private and trading corporations. Railroads are, in every essential quality, public highways, created for public use, but permitted to be owned, controlled and managed by private persons. But for this quality the railroads of the respondents could not lawfully exist. Their construction depended upon the exercise of the right of eminent domain, which belongs to the State in its corporate capacity alone, and cannot be conferred, except upon a "*public use.*" The State has no power to grant the right of eminent domain to any corporation or person for other than a public use. Every attempt to go beyond that is void by the constitution; and although the legislature may determine what is a necessary public use, it cannot by any sort of enactment divest of that character any portion of the right of

eminent domain which it may confer. This characteristic of public use is in no sense lost or diminished by the fact that the use of the railroad by the corporation which constructs or owns it, must, from its nature be exclusive. That incident grows out of the method of use which does not admit of any enjoyment in common by the public. The general and popular use of a railroad as a highway is therefore handed over exclusively to corporate management and control because that is for the best and manifest advantage of the public. The progress of science and skill has shown that highways may be created for public use, of such form and kind that the best and most advantageous enjoyment by the people can only be secured through the ownership, management and control of corporate bodies created for that purpose, and the people of the State are not restricted from availing themselves of the best modes for the carriage of their persons and property. There is nothing in the Constitution hostile to the adoption and use by the State of any and every newly developed form or kind of travel and traffic, which have a public use for their end and aim, and giving to them vital activity by the use of the power of eminent domain.

When the earliest Constitution of our State was adopted, railroads were unknown. The public highways of the State were its turnpikes, ordinary roads and navigable waters. The exercise of eminent domain in respect of them, was permitted by the Constitution for the same reasons that adapt it now to the greatly improved methods of travel and transportation; and in making this adaptation, there is no enlarged sense given to the language of the Constitution, so long as its inherent purpose — the creation only of public uses — be faithfully observed.

These principles are abundantly sustained by authority. In *Bloodgood* v. *The Mohawk and Hudson River Railroad Company* (18 Wend., 9), the court of last resort in this State first announced them, and affixed to railroads their true character as public highways. It is there declared that the fact that railroad corporations may remunerate themselves by tolls and fares, "does not destroy the public nature of the road, or convert it from a public to a private use. * * * If it is a public franchise and granted to the company for the purpose of providing a mode of public conveyance, the company, in accepting it, engages, on its part, to use it in such

manner as will accomplish the object for which the legislature designed it." (Pages 21, 22.)    And in *Olcott* v. *The Supervisors* (16 Wall, 678, on p. 694), the Supreme Court of the United States adjudge : " that railroads, though constructed by private corporations and owned by them, are public highways, has been the doctrine of nearly all the courts ever since such conveniences for passage and transportation have had any existence.    Very early the question arose whether a State's right of eminent domain could be exercised by a private corporation created for the purpose, of constructing a railroad. Clearly it could not, unless taking land for such a purpose by such an agency is taking land for public use.    The right of eminent domain nowhere justifies taking property for private use.    Yet it is a doctrine universally accepted, that a State legislature may authorize a private corporation to take land for the construction of such a road, making compensation to the owner.    What else does this doctrine mean, if not that building a railroad, though it be built by a private corporation, is an act done for a public use?    And the reason why the use has always been held a public one is that such a road is a highway, whether made by the government itself, or by the agency of corporate bodies, or even by individuals, when they obtain their power to construct it from legislative grant.    *    *    * Whether the use of a railroad is a public or a private one, depends in no measure upon the question who constructed it or who owns it.    It has never been considered a matter of any importance that the road was built by the agency of a private corporation.    *No matter who is the agent, the function performed is that of the State.    Though the ownership is private, the use is public.*    *    *    * The owners may be private companies, *but they are compellable to permit the public to use their works in the manner in which such works can be used*.    That all persons may not put their own cars upon the road, and use their own motive power, has no bearing upon the question whether the road is a public highway.    It bears only upon the mode of use, of which the legislature is the exclusive judge."

All public highways are subjects of general State jurisdiction, because their uses are the common property of the public.    This principle of the common law is in this State of universal application.    As to the class of public highways known as railroads, the

common law is fortified by the express conditions of the statutes creating or regulating or controlling them.

The general railroad act of this State may now be regarded as the general charter of all such corporations. It authorizes the organization of corporations for "the constructing, maintaining and operating" of railroads "*for public use*," and it imposes upon them the duty "to furnish accommodations for all passengers and property, and to transport all persons and property on payment of fare or freight." (Laws of 1850, chap. 140, §§ 1, 36.) These words are a brief summary in respect of the duties imposed upon such corporations by all the provisions of the act. Those duties are consigned to them as public trusts, and as was said in *Messenger* v. *The Pennsylvania Railroad Company* (36 N. J., 407), "although in the hands of a private corporation, they are still sovereign franchises, and must be used and treated as such; they must be held in trust for the general good." This relation of such a corporation to the State is forcibly expressed by EMMONS, J., in *Talcott* v. *Township of Pine Grove* (1 Flippin U. S. Circuit Ct. Rep., 144): "The road once constructed is, *instanter*, and by mere force of the grant and law, embodied in the governmental agencies of the State and dedicated to public use. All and singular its cars, engines, rights of way and property of every description, real, personal and mixed, are but a trust fund for the political power, like the functions of a public office. The judicial personage — the corporation created by the sovereign power expressly for this sole purpose and no other — is, in the most strict technical and unqualified sense, but its trustee. This is the primary and sole legal-political motive for its creation. The incidental interest and profits of individuals are accidents, both in theory and practice."

The acceptance of such trusts on the part of a corporation, by the express and implied contracts already referred to, makes it an agency of the State to perform public functions which might otherwise be devolved upon public officers. The maintenance and control of most other classes of public highways are so devolved, and the performance of every official duty in respect of them may be compelled by the courts, on application of the State, while private damages may also be recoverable for individual injuries. The analogy between such officials and railroad corporations in regard

to their relations to the State, is strong and clear, and so far as affects the construction and proper and efficient maintenance of their railways will be questioned by no one. It is equally clear, we think, in regard to their duty as carriers of persons and property. This springs sharply out of the exclusive nature of their right to do those things. On other public highways every person may be his own carrier; or he may hire whomsoever he will to do that service. Between him and such employe a special and personal relation exists, independent of any public duty, and in which the State has no interest. In such a case, the carrier has not contracted with the State to assume the duty *as a public trust*, nor taken the right and power to do it from the State by becoming the special donee and depositary of a trust. A good reason may, therefore, be assigned why the State will not by *mandamus* enforce the performance of his contract by such a carrier. But the reason for such a rule altogether fails when the public highway is the exclusive property of a body corporate, which alone has power to use it, in a manner which of necessity requires that all management, control and user for the purposes of carriage must be limited to itself, and which, as a condition of the franchise that grants such absolute and exclusive power over and user of a public highway, has contracted with the State to accept the duty of carrying all persons and property within the scope of its charter, as a public trust. The relation of the State to such a body is entirely different from that which it bears to the individual users of a common highway, as between whom and the State no relation of trust exists; and there is small reason for seeking analogies between them. It is the duty of the State to make and maintain public highways. That duty it performs by a scheme of laws, which set in operation the functions of its political divisions into counties, towns and other municipalities, and their officers. It can and does enforce those duties whenever necessary through its courts. It is not the duty of the State to be or become a common carrier upon its public highways; but it may, in some cases, assume that duty, and whenever it lawfully does so, the execution of the duty may be enforced against the agents or officers upon whom the law devolves it. It may grant its power to construct a public highway to a corporation or an individual and with that power its right of

eminent domain in order to secure the public use; and may make the traffic of the highway common to all on such terms as it may impose. In such case it is its duty to secure that common traffic, when refused, by the authority of its courts. (*People* v. *Collins*, 19 Wend., 56; *People* v. *Commissioners of Salem*, 1 Cow., 23.) Or it may grant the same powers of construction and maintenance with the exclusive enjoyment of use which the manner of use requires, and if that excludes all common travel and transportation it may impose on the corporation or person, the duty to furnish every requisite facility for carrying passengers and freight, and to carry both in such manner and at such times as public needs may require. Why is that duty, in respect of the power to compel its performance through the courts, not in the category of all others intrusted to such a body? The writ of *mandamus* has been awarded to compel a company to operate its road as one continuous line (*Union Pacific R. R. Co.* v. *Hall*, 91 U. S., 343); to compel the running of passenger trains to the terminus of the road (*State* v. *H. and N. H. Ry. Co.*, 29 Conn., 538); to compel the company to make fences and cattle guards (*People ex rel. Garbutt* v. *Rochester State Line R. R. Co.*, 14 Hun, 376; S. C., 76 N. Y., 291); to compel it to build a bridge (*People ex rel. Kimball* v. *B. and A. R. R. Co.*, 70 N. Y., 569); to compel it to construct its road across streams, so as not to interfere with navigation (*State* v. *N. E. R. R. Co.*, 9 Richardson, 247); to compel it to run daily trains (*In re New Brunswick, etc., R. R.*, 1 P. & B., 667); to compel the delivery of grain at a particular elevator (*Chicago and Northwestern R. R. Co.* v. *People*, 56 Ill., 365); to compel the completion of its road (*Farmers' Loan and Trust Company* v. *Henning*, 17 Am. Law Reg. [N. S.], 266); to compel the grading of its track so as to make crossings convenient and useful (*People ex rel. Green* v. *D. and C. R. Co.*, 58 N. Y., 152; *N. Y. C. and H. R. R. R. Co.* v. *People*, 12 Hun, 195; S. C., 74 N. Y., 302; *Indianapolis R. R. Co.* v. *The State*, 37 Ind., 489; to compel the re-establishment of an abandoned station (*State* v. *R. R.*, 37 Conn., 154); to compel the replacement of a track taken up in violation of its charter (*Rex* v. *Severn and Wye Ry. Co.*, 2 Barn. & Ald., 646); to prevent the abandonment of a road once completed (*Talcott* v. *Pine Grove*,

*supra*, 1 Flippin, 145); and to compel a company to exercise its franchise. (*People* v. *A. and V. R. R. Co.*, 24 N. Y., 261.) These are all express or implied obligations arising from the charters of the railroad companies, but not more so than the duty to carry freight and passengers. That duty is, indeed, the *ultima ratio* of their existence; the great and sole public good for the attainment and accomplishment of which all the other powers and duties are given or imposed. It is strangely illogical to assert that the State, through the courts, may compel the performance of every step necessary to bring a corporation into a condition of readiness to do the very thing for which it is created, but is then powerless to compel the doing of the thing itself.

We cannot bring our minds to entertain a doubt that a railroad corporation is compellable by *mandamus* to exercise its duties as a carrier of freight and passengers; and that the power so to compel it rests equally firmly on the ground that that duty is a public trust, which having been conferred by the State and accepted by the corporation may be enforced for the public benefit; and also upon the contract between the corporation and the State, expressed in its charter or implied by the acceptance of the franchise (*Abbott* v. *Johnstown R. R. Co.*, 80 N. Y., 31); and also upon the ground that the common right of all the people to travel and carry upon every public highway of the State has been changed in the special instance, by the legislature for adequate reasons into a corporate franchise, to be exercised solely by a corporate body for the public benefit, to the exclusion of all other persons, whereby it has become the duty of the State to see to it that the franchise so put in trust be faithfully administered by the trustee.

But it is said that the State is not injured and has no interest in the question whether the corporation perform the duty or not. The State may suffer no direct pecuniary injury, as it may not by the neglect of one or more of its numerous political officers who hold in trust for the people the official duties reposed in their hands; but that is no test of the power or duty of the State in either case. The sovereignty of the State is injured whenever any public function vested by it in any person, natural or artificial, for the common good is not used or is misused, or is abused; and it is not bound to inquire whether some one or more of its citizens has not thereby

received a special injury for which he may recover damages in his private suit. Such an injury wounds the sovereignty of the State and thereby, in a legal sense, injures the entire body politic. The State, in such a case as this, has no other adequate remedy. It may proceed, it is true, to annul the corporation, as has been held in many cases where corporations had neglected public duties. (*People* v. *Fishkill and B. P. R. Co.*, 27 Barb., 452, 458; *People* v. *H. and C. Turnpike Co.*, 23 Wend., 254; *Turnpike Co.* v. *State*, 3 Wall., 210; *People* v. *K. and M. Turnpike Co.*, 23 Wend., 208; *People* v. *B. and R. Turnpike Co.*, Id., 222; *Charles River Bridge Co.* v. *Warren Bridge*, 7 Pick., 344.) But that remedy is not adequate, for it only destroys functions where the public interests require their continued existence and enforcement. It has, therefore, an election which of these remedies to pursue. (*State* v. *H. and N. H. Railroad Co.*, 29 Conn., 538; *People* v. *A. and V. Railroad Co.*, 24 N. Y., 261; *Talcott* v. *Pine Grove, supra.*)

Undoubtedly a sound discretion is vested in its law officer to decide whether the exigency is such as to call for the use of either remedy, as it is ultimately for the court to judge whether the elected remedy should be applied. But upon the question of power and of sufficient legal injury to justify its use, where the corporation neglects or refuses to exercise its franchises or perform its duites, there seems to us no reason to doubt.

Nor do we think the fact that injured individuals may have private remedies for the damages they have sustained by neglect of duties, precludes the State from its remedy by *mandamus.* Where the injury is to a single person under circumstances which do not affect the general public the courts, in the exercise of their discretion, have properly refused this remedy on his relation. The injured party is then the suitor; he has an adequate remedy by private action for damages. That was the case of *People ex rel. Ohlen* v. *Erie Railway Company* (22 Hun, 533), relied upon by the court below, in which the court held that the relator's remedy was by suit for damages and not by *mandamus.* That case is not authority for denying the writ to the Attorney-General for a neglect or refusal by corporations to exercise their franchises to an extent which affects a great number of citizens, and continues for a considerable period of time; nor does it deny the right of the people acting on their

own behalf and in their own suit to pursue this remedy in any case of neglect or refusal to exercise a public function which the interest of the people require should be kept in vigorous and efficient use.

The court, in that care, recognizes the distinction, when it says, " an exception exists," * * * " where a corporation suspends the exercise of its franchises." The suspension of the exercise of corporate functions is the gravamen of the complaint in this case; and the case cited is no authority for denying the writ when the people come into court with their own suit, by their attorney-general to move for a writ of *mandamus* on allegations of an alleged long continued and very general suspension of a corporate duty.

It was supposed by the court below that the provisions of section 28 of the act of 1850 (chap. 140) as amended by chapter 133 of the Laws of 1880, which provide that railroad corporations shall have power " to regulate the time and manner in which passengers and property shall be transported," interfere in some way with the power to grant the writ. Undoubtedly that provision gives the discretion which the learned judge states; but it cannot be so construed as to justify a general or partial suspension of the duty of receiving and transporting freight. Language of that kind in a similar act was correctly construed by DICKERSON, J., in the *Railroad Commissioners* v. *Portland and Oxford Railroad Company* (63 Me., 269). We adopt, but have not room to quote his language.

Having determined the question of the right of the State to prosecute the writ of *mandamus* on the ground of refusal or neglect of a corporation to exercise its duty of carrier, it remains to be seen whether a case which would justify the granting of the writ was presented. The case stands altogether upon the facts presented by the appellants. The course taken by the respondents must be regarded as an admission of the material facts contained in the petition and affidavits.

The petition in each case alleges that the said railroad company, since about the 16th day of June, 1882, " has substantially refused to discharge its duties as a common carrier, and has, to a material degree, suspended the exercise of its franchises by refusing to take freight which has been offered at its stations in the city of New York for transportation, at the usual rates and upon the usual

terms;" and that said railroad company has refused to accept and transport the greater part of the outgoing, and to deliver the incoming freight and property of the merchants doing business in the city of New York, who have relations with and need for the services of such railway, and has refused to them to furnish adequate transportation for the same, so that from that date the business community of the city of New York are unable to obtain sufficient and adequate transportation for their goods on said railroad, although they have offered the same on the usual terms and rates of transportation; but said railroad has uniformly delayed and sometimes peremptorily refused to receive and deliver freight, and to transport the outgoing freight as aforesaid, and at certain points within the State has declined to receive incoming freight, whereby great loss and damages accrue to the people of the State of New York, for which there is no adequate remedy in damages, and that the trade and commerce of said city is greatly injured by the action of the said railroad."

These allegations are broad enough to show a quite general and largely injurious refusal and neglect to perform the duties of carrier. The affidavits go far to sustain these allegations; but it is not important to examine them minutely, because the omission of a demurrer *ore tenus* extends to and admits the well-pleaded averments of the petition. Stated very briefly, the affidavits show that, for about two weeks, the respondents failed and neglected to receive from three-quarters to seven-eighths of the goods offered for transportation from the city, and large quantities seeking transportation to the city; and in many instances refused to receive goods offered, and turned them back and closed their gates during business hours, thus causing a stoppage of all delivery of freight; that in some instances unusual terms were sought to be imposed as a condition of receiving goods, which would increase the risks of the owner; that the refusal to receive goods did not arise from any unwillingness or inability on the part of the shipper to pay charges, but was wholly the act of respondents; that it was so continuous and extensive that it seriously interfered with the business operations of the citizens of New York, deteriorated the value of many commodities, and caused a diversion of trade from the city; that great losses were caused, and especially that large quantities of perishable goods,

by reason of non-delivery, were destroyed, to the value of many thousand dollars ; that a vast amount of freight, equal, as estimated, to 360,000 tons, was thus detained or refused carriage ; that large numbers of carmen were detained in their efforts to deliver freight, and the injury to that branch of business is estimated at not less than $50,000, while the aggregate of injuries is estimated at some millions. These are the substantial facts conceded by the respondents at the Special Term. Surely, it cannot be doubted that these facts, being true and unexcused, showed a strong case for the interference of the State.

The only question is, whether the course and conduct of the respondents was so far excused by anything appearing in the petition and affidavits that the court was justified in denying the motion for the writ on its merits, or in a wise exercise of its judicial discretion.

The excuse appears only in the statements of the reasons assigned by the respondents for their refusal to accept, transport and deliver the freight and property. In the petition it is stated in these words, " that the persons in their employ handling such freight refuse to perform their work unless some small advance, said to be three cents per hour, is paid them by the said railroad corporation." The affidavits show, it may in short be said, that the skilled freight handlers of the respondents, who had been working at the rate of seventeen cents per hour (or one dollar and seventy cents for ten hours), refused to work unless twenty cents per hour, or two dollars per day of ten hours, were paid, and that their abandonment of the work, and the inefficiency of the unskilled men afterwards employed, caused the neglect and refusal complained of.

It is not alleged or shown that the workmen committed any unlawful act, and no violence, no riot and no unlawful interference with other employes of the respondents appear. It is urged in effect that the court should regard the case as one of unlawful duress, caused by some breach of law sufficiently violent to prevent the reception and transportation of freight. There is nothing in the papers to justify this contention. According to the statements of the case, a body of laborers, acting in concert, fixed a price for their labor, and refused to work at a less price. The respondents fixed a price for the same labor, and refused to pay more. In

doing this neither did an act violative of any law, or subjecting either to any penalty. The respondents had a lawful right to take their ground in respect of the price to be paid, and adhere to it, if they chose; but if the consequence of doing so were an inability to exercise their corporate franchises to the great injury of the public, they cannot be heard to assert that such consequence must be shouldered and borne by an innocent public, who neither directly nor indirectly participated in their causes.

If it had been shown that a "strike" of their skilled laborers had been caused or compelled by some illegal combination or organized body, which held an unlawful control of their actions, and sought through them to enforce its will upon the respondents, and that the respondents, in resisting such unlawful efforts, had refused to obey unjust and illegal dictation, and had used all the means in their power to employ other men in sufficient numbers to do the work, and that the refusal and neglect complained of had grown out of such a state of facts, a very different case for the exercise of the discretion of the court, as well as of the attorney-general, would have been presented. Whether such a state of facts could have been shown or not we cannot judicially know. The present case must stand or fall upon the papers before us; and we are not to be swerved from thus disposing of it by any suggestion of facts not in the case which might lead, if they appeared, to some other result. The most that can be found from the petition and affidavits is that the skilled freight handlers of the respondents refused to work without an increase of wages to the amount of three cents per hour; that the respondents refused to pay such increase; that the laborers then abandoned the work, and that the respondents did not procure other laborers competent or sufficient in number to do the work, and so the numerous evils complained of fell upon the public, and were continuous until the people felt called upon to step in and seek to remedy them by proceedings for *mandamus.*

These facts reduce the question to this: Can railroad corporations refuse or neglect to perform their public duties upon a controversy with their employes over the cost or expense of doing them? We think this question admits of but one answer. The excuse has in law no validity. The duties imposed must be discharged at whatever cost. They cannot be laid down or abandoned or suspended

without the legally expressed consent of the State. The trusts are active, potential and imperative and must be executed until lawfully surrendered, otherwise a public highway of great utility is closed or obstructed *without any process recognized by law.* This is something no public officer charged with the same trusts and duties in regard to other public highways can do without subjecting himself to *mandamus* or indictment.

We are not able to perceive the difficulties that embarrassed the court below as to the form of a writ of *mandamus* in such cases. It is true the writ must be specific as to the thing to be done ; but the thing to be done in this case was to resume the duties of carriers of the goods and property offered for transportation ; that is, to receive, carry and deliver the same under the existing rules and regulations as the business had been accustomed to be done. There was no necessity to specify what kind of goods should be first received and carried, or whose goods, or indeed to take any notice of the details of the established usages of the companies. It was the people who were invoking the writ on their own behalf and. not for some private suitor, or to redress individual injuries. The prayer of the petition indicated the proper form of the writ. Upon the return to the writ all questions, whether what has been done is a sufficient compliance with its command, may properly arise and become a subject of further consideration. (*People ex rel. Green* v. *D. and C. R. R. Co.,* 58 N. Y., 152, 160, 161.) They need not have been anticipated. It is suggested that the time has now past when such a writ can be of any valuable effect. This is probably so, but we are governed by the record in disposing of the appeal and not by subsequently occurring events.

The appellants labor now under a judgment alleged to be injurious to the rights they possessed when it was pronounced, and harmful to them as a precedent. If erroneous they are entitled to have that judgment reversed, and to be indemnified, in the discretion of the court, for the costs incurred on the appeal made necessary by the error.

We think the court below had power to award the writ, and that upon the case presented it was error to refuse it.

The order should be reversed, with the usual costs, and an order

entered, if deemed advisable from any existing circumstances by the attorney-general, awarding the writ.

DANIELS and BRADY, JJ., concurred.

Orders reversed, with ten dollars costs and disbursements in each case.