JONES v. NEWPORT NEWS & M. V. CO.

(Circuit Court of Appeals, Sixth Circuit. February 5, 1895.)

No. 173.

1. RAILROADS—SWITCH TO PRIVATE WAREHOUSE—DISCONTINUANCE.
    A railroad company, as a carrier, is not bound, at common law, by the establishment and maintenance for any length of time of a switch connection of its main line with a private warehouse, forever to maintain it.

2. SAME—ABUSE OF DISCRETION.
    Even if a railroad company may be liable for damages for an abuse of discretion in discontinuing such a switch, the person complaining must negative the dangerous character of the switch which the facts stated in regard to it in his petition suggest as a good ground for its discontinuance.

3. SAME—CONTRACT.
    An agreement by a railroad company, with one owning land adjacent to its track, that, if he would build a coal tipple and a trestle therefrom to its track, it would construct a switch thereon, and thereafter deliver coal to him there, does not contain an implication that the switch shall be perpetual.

In Error to the Circuit Court of the United States for the District of Kentucky.

Action by H. M. Jones against the Newport News & Mississippi Valley Company for injury to and discontinuance of a railroad

switch to plaintiff's warehouse.    A demurrer was sustained to that part of the petition which claimed damages for discontinuance of the switch, and plaintiff brings error.    Affirmed.

H. M. Jones, the plaintiff in error and the plaintiff below, filed two petitions in ordinary in the Caldwell circuit court of Kentucky against the Newport News & Mississippi Valley Company, a corporation organized under the laws of Connecticut, and a citizen of that state, engaged in operating under a lease the railroad of the Chesapeake & Ohio Southwestern Railroad Company. The plaintiff is the owner of land in the town of Princeton, lying near the junction of two streams, and within a few feet of the defendant's railroad bridge over one of them. The lot adjoins the right of way of defendant's railroad. The railroad at this point runs on a high embankment or fill. Some years before the filing of the petition, the plaintiff had built himself a coal tipple and storage bins for coal on his lot, and near the defendant's right of way, and a trestle, 15 feet high, above the ground, connecting the coal tipple with the defendant's roadbed on the high embankment. A railroad track was laid over the trestle, so that the cars could be run from the main track by a switch to the tipple. Plaintiff's first petition averred that, by the negligence of the agents of the railroad company, the switch from the main track of the railroad to the coal tipple was left open, and a regular freight train, running at a high rate of speed, left the main track, and running out upon the trestle, was precipitated over the tipple, doing much damage to the plaintiff's plant, for which he asked damages. The second petition, which, by the order of the court, was consolidated with the first, described the circumstances under which the trestle and connection track were built as follows: "That several years ago the plaintiff, desiring to go into the coal business at Princeton, Kentucky, and desiring to build for that purpose a coal tipple on said lot, and connect the same with the main line of said railroad, owned and then operated by the Chesapeake & Ohio Southwestern Railroad Company, by trestle and a railroad track, or switch, as it is sometimes called, had plans and specifications drawn for such coal tipple and trestle; and thereupon the said Chesapeake & Ohio Southwestern Railroad Company made and entered into a contract with him, this plaintiff, that, if this plaintiff would build the proposed coal tipple and trestle, it would make the necessary embankment, connect the trestle with its main line of road, and lay down the track over said embankment, trestle, and coal tipple, and connect the same with the main line of road by a switch, and thereafter deliver coal to him at said tipple, over said switch and road, on said trestle and coal tipple, and this contract was made in the early part of 1884. That, in compliance with this contract, this said plaintiff, in the summer of 1884, built said coal tipple and trestle in accordance with said plans and specifications, and the said Chesapeake & Ohio Southwestern Railroad Company built said embankment and laid said track thereon, and on said trestle and coal tipple, and connected the same with the main line of said railroad with a switch, and then it became a part of said main line of road, and so remained until the doing of the wrongs hereinafter complained of; and said last-named railroad company and the defendant delivered coal in car-load lots over said switch to said coal tipple, as was their duty, from that time until the time of the doing of the wrongs hereinafter complained of, as the business of the plaintiff required said coal to be delivered. That said coal tipple and trestle were built of heavy timber, and were about fifteen feet high, and were very expensive, and cost this plaintiff not less than $———; and, in addition thereto, he built a room under one of the bents of said coal tipple, and fitted it up for an office, bought and put up a pair of wagon scales, built a bridge across the Dallam Spring, which was necessary to get the wagons to the scales, put a roof over the coal tipple, bought a wagon and a pair of mules, and in every way fitted himself up to run a coal business, and did run a coal business, at that place and on said coal tipple, for a number of years, and until the doing of the wrongful acts hereinafter complained of. Said trestle and coal tipple is the same mentioned in the first paragraph of this petition. That afterwards the Chesapeake & Ohio Southwestern Railroad Company leased said railroad from Louisville to Paducah, Ky., through Princeton, Ky., to the defendant,

which took possession under said lease, and for several years last past has operated and controlled said road under said lease, and assumed the duties and contracts of said lessor company, including its duty to and contract with this plaintiff, and for several years fulfilled and performed said duty and contract, and then, ratifying the old contract, made a new one with this plaintiff, by which he was to repair and rebuild a part of said trestle, which he did at great expense, not less than $———, to himself, and it was its duty at all times to keep said switch to said coal tipple in good order, and to deliver coal to him over said switch to said coal tipple; but, notwithstanding said contract and said duty, the defendant has violated its contract and its duty, and soon after the accident referred to in the first paragraph of this petition, and in the month of ———, 1892, the defendant wrongfully and without right tore up and removed said switch and all the iron forming the railroad from the main line of road to said coal tipple over said trestle, and has since wrongfully and without right refused to relay said track, or to deliver coal to this plaintiff at said coal tipple, thus rendering worthless to this plaintiff, and utterly destroying, the value of said coal tipple and trestle, and utterly breaking up and ruining the plaintiff's said coal business, to the damage of this plaintiff five thousand dollars, which damage said defendant refuses to pay, although demanded. Wherefore the plaintiff prays for damages against the defendant for five thousand dollars, and for interest thereon from date of judgment until paid, and for his costs and all proper relief." The two petitions were carried by removal from the state circuit court into the court below, where they were consolidated as already stated, and thereafter the defendant demurred to both causes of action. The demurrer to the first cause of action was overruled. The demurrer to the second cause of action was sustained, and upon that judgment was entered for the defendant. The first cause of action was submitted to the jury, and resulted in a verdict and judgment for the plaintiff. The plaintiff sued out a writ of error to the ruling of the court in sustaining the demurrer to the second cause of action, and in rendering judgment for the defendant thereon. The correctness of the ruling of the circuit court in sustaining the demurrer to the second cause of action is therefore the sole question for consideration in this court.

Wm. Marble and Husbands & Husbands, for plaintiff in error.

Quigley & Quigley and P. H. Darby, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts). Plaintiff bases his claim for damages—First, on the violation of an alleged common-law duty; and, second, on the breach of a contract.

1. The proposition put forward on plaintiff's behalf is that when a railroad company permits a switch connection to be made between its line and the private warehouse of any person, and delivers merchandise over it for years, it becomes part of the main line of the railroad, and cannot be discontinued or removed, and this on common-law principles and without the aid of a statute. It may be safely assumed that the common law imposes no greater obligation upon a common carrier with respect to a private individual than with respect to the public. If a railroad company may exercise its discretion to discontinue a public station for passengers or a public warehouse for freight without incurring any liability or rendering itself subject to judicial control, it would seem necessarily to follow that it may exercise its discretion to establish or discontinue a private warehouse for one customer.

In Northern Pac. Ry. Co. v. Washington Territory, 142 U. S. 492, 12 Sup. Ct. 283, it was held that a mandamus would not lie to

compel a railroad company to establish a station and stop its trains at a town at which for a time it did stop its trains and deliver its freight.

In Com. v. Fitchburg R. Co., 12 Gray, 180, it was attempted to compel a railroad company to run regular passenger trains over certain branch lines upon which they had been run for a long time, but had been discontinued because they were unremunerative. The court held that mandamus would not lie because the maintenance of such facilities was left to the discretion of the directors. Referring to this and other cases, Mr. Justice Gray, delivering the opinion of the supreme court in Northern Pac. Ry. Co. v. Washington Territory, supra, said:

"The difficulties in the way of issuing a mandamus to compel the maintenance of a railroad and the running of trains to a terminus fixed by the charter itself are much increased when it is sought to compel the corporation to establish a station, or to maintain a station, or to stop its trains at a particular place on the line of its road. The location of stations and warehouses for receiving and delivering passengers and freight involves a comprehensive view of the interests of the public, as well as of the corporation and its stockholders, and a consideration of many circumstances concerning the amount of the population and business at, near, or within convenient access to one point or another, which are more appropriate to be determined by the directors, or in case of abuse of their discretion by the legislature, or by administrative boards intrusted by the legislature with that duty, than by ordinary judicial tribunals. * * * To hold that the directors of this corporation, in determining the number, place, and size of its stations and other structures, having regard to the public convenience as well as to its own pecuniary interests, can be controlled by the courts by writ of mandamus, would be inconsistent with many decisions of high authority in analogous cases."

Among the cases which Mr. Justice Gray cites in support of the foregoing is that of People v. New York, L. E. & W. R. Co., 104 N. Y. 58, 9 N. E. 856. In that case it was sought to compel a railroad company by mandamus to enlarge a passenger and freight station which was admittedly inadequate, but the writ was denied. The ground for the conclusion of the court, as stated by Mr. Justice Gray, was that "the defendant, as a carrier, was under no obligation, at common law, to provide warehouses for freight offered, or station houses for passengers waiting transportation," and no such duty was imposed by statute.

See, also, Florida, C. & P. R. Co. v. State, 31 Fla. 482, 13 South. 103.

It is true that the foregoing were cases of mandamus, and that the court exercises a discretion in the issuance of that writ which cannot enter into its judgment in an action for damages for a breach of duty. But the cases show that the reason why the writ cannot go is because there is no legal right of the public at common law to have a station established at any particular place along the line, or to object to a discontinuance of a station after its establishment. They make it clear that the directors have a discretion in the interest of the public and the company to decide where stations shall be, and where they shall remain, and that this discretion cannot be controlled in the absence of statutory provision. Such uncontrollable discretion is utterly inconsistent with the existence of a legal duty to maintain a station at a particular place, a breach of which can give

an action for damages. If the directors have a discretion to establish and discontinue public stations, a fortiori have they the right to discontinue switch connections to private warehouses. The switch connection and transportation over it may seriously interfere with the convenience and safety of the public in its use of the road. It may much embarrass the general business of the company. It is peculiarly within the discretion of the directors to determine whether it does so or not. At one time in the life of the company, it may be useful and consistent with all the legitimate purposes of the company. A change of conditions, an increase in business, a necessity for travel at higher speed, may make such a connection either inconvenient or dangerous, or both. We must therefore dissent altogether from the proposition that the establishment and maintenance of a switch connection of the main line to a private warehouse for any length of time can create a duty of the railroad company at common law forever to maintain it. There is little or no authority to sustain it.

The latest of the Illinois cases which are relied upon is based upon a constitutional provision which requires all railroad companies to permit connections to be made with their track, so that the consignee of grain and any public warehouse, coal bank, or coal yard may be reached by the cars of said railroad. The supreme court of that state has held that the railroad company has a discretion to say in what particular manner the connection shall be made with its main track, but that this discretion is exhausted after the completion of the switch and its use without objection for a number of years. Railroad Co. v. Suffern, 129 Ill. 274, 21 N. E. 824. But this is very far from holding that there is any common-law liability to maintain a side track forever after it has once been established. The other Illinois cases (Vincent v. Railroad Co. 49. Ill. 33; Chicago & N. W. Ry. Co. v. People, 56 Ill. 365) may be distinguished in the same way. They depended on statutory obligations, and were not based upon the common law, though there are some remarks in the nature of obiter dicta which gives color to plaintiff's contention. But it will be seen by reference to Mr. Justice Gray's opinion, already quoted from, that the Illinois cases have exercised greater power than most courts in controlling the discretion of railroads in the conduct of their business.

In Barre R. Co. v. Montpelier & W. R. Co., 61 Vt. 1, 17 Atl. 923, the question was one of condemnation. The law forbade one railroad company to condemn the line of another road, and the question was whether the side tracks of the railroad company which, with the consent of the owners of the granite quarry, ran into a quarry in which a great business was done, were the line of the railroad within the meaning of the statute. It was held that they were so far as to impose obligations on and create exemptions in favor of the railroad company operating the side tracks. We may concede, for the purpose of this case, without deciding, that, as long as a railroad company permits a side track to be connected with its main line for the purpose of delivering merchandise in car-load lots to the owner of the side track, the obligation of the railroad com-

pany is the same as if it were delivering these cars at its own warehouse, on its own side track. But this we do not conceive to be inconsistent with the right of the directors of the railroad company, exercising their discretion in the conduct of the business of the company for the benefit of the public and the shareholders, to remove a side-track connection.

The recital of the facts in the petition in this case is enough to show that the switch connection of the plaintiff was one of probable or possible danger to the public using the railroad, and to justify its termination for that reason. It was made on a high fill, on the approach to a bridge across a stream, and the switch track ran on to a trestle 15 feet above the ground, and terminating in the air. Even if the discretion reposed in the directors to determine where switch connections shall be made or removed were one for the abuse of which an action for damages would lie, the petition would be defective, because it does not attempt in any way to negative the dangerous character of the switch which the facts stated certainly suggest as a good ground for the action of the company complained of.

2. The petition makes no better case for the plaintiff on the theory of a contract than on a common-law liability. It is not alleged that either the defendant or its predecessor agreed to keep the switch in the main line for any definite time, or that either expressly agreed to keep it there forever. The plaintiff contends that, nothing having been said as to the time, the implication is that the switch was to be maintained at all times, i. e. forever. Such a construction is quite at variance with the views of the supreme court, as expressed in Texas & P. Ry. Co. v. City of Marshall, 136 U. S. 393, 10 Sup. Ct. 846. In that case the city of Marshall filed a bill in equity to enforce an agreement with the railroad company under which it had given the railroad company $300,000 in county bonds and 66 acres of land in the city limits, and the company, in consideration of the donation, agreed "to permanently establish its eastern terminus and Texas office at the city of Marshall, and to establish and construct at said city the main machine shops and car works of said railroad company." It was held that the contract on the part of the railroad company was satisfied and performed when the company had established and kept a depot and offices at Marshall, and set in operation said car works and machine shops there, and kept them going for eight years, and until the interests of the railway company and the public demanded a removal of all or part of these subjects of the contract to some other place; that the word "permanent," in the contract, was to be construed with reference to the subject-matter of the contract, and, under the circumstances of the case, it was complied with by the establishment of the shops, with no intention at the time of removing or abandoning them; that if the contract were to be interpreted as one to maintain forever the eastern terminus and the shops and Texas office at Marshall, without regard to the convenience of the public, it would become a contract that could not be enforced in equity. In this case, Mr. Justice Miller, speaking for the court, and referring to the contract, said:

"But it did not amount to a covenant that the company would never cease to make its eastern terminus at Marshall; that it would forever keep up the depot at that place; that it would for all time continue to have its machine shops and car shops there; and that, whatever might be the changes of time and circumstances of railroad rivalry and assistance, these things alone should remain forever unchangeable. Such a contract, while we do not say that it would be void on the ground of public policy, is undoubtedly so far objectionable as obstructing improvements and changes which might be for the public interest, and is so far a hindrance in the way of what might be necessary for the advantage of the railroad itself, and of the community which enjoyed its benefits, that we must look the whole contract over critically before we decide that it bears such an imperative and such a remarkable meaning."

In the light of this construction of an express agreement to locate and maintain a depot permanently at a town on the line of a railroad, it would seem clear that we should not imply in a contract for a private switch connection a term that it shall be perpetual, and thus forever limit the discretion of the directors to deal with a subject which may seriously affect the convenience or safety of the public in its use of the road.

The judgment of the circuit court is affirmed, with costs.