## BROWN v. SOUTHERN RY. CO.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1911.)

No. 2,083.

RAILROADS (§ 216\*)—SWITCH TRACKS—MAINTENANCE—CONTRACT—INSTRUCTION —"SHALL AND MAY."

Complainant owned a coalyard, through which defendant operated a switch track. The railroad claimed to own the rails and ties, and, complainant refusing to concede that such was the fact, negotiations were entered into for the execution of a contract, in which complainant should concede to the railroad company a right of way and its ownership of the track, in consideration of which the railroad company should maintain the track and afford complainant service. Complainant having refused to route all possible traffic over defendant's road, further negotiations resulted in a contract by which, in consideration of a dollar paid by the railroad company, complainant admitted that it was the lawful owner of the track, agreeing that defendant, its successors and assigns, "shall and may have the right" to maintain and operate the side track until complainant, his heirs and assigns, shall serve on the railway company 60 days' notice to remove the same. This contract was signed only by complainant and certain trustees under a mortgage deed to the property, and not by the railroad company. *Held,* that the words "shall and may" as so used should not be construed as implying an absolute obligation on the part of the railway company, and that complainant was not entitled to restrain the railroad company from refusing to maintain the track.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 713; Dec. Dig. § 216.\*]

Appeal from the Circuit Court of the United States for the Western District of Tennessee.

Bill by R. L. Brown against the Southern Railway Company. Decree for defendant, and complainant appeals. Affirmed.

Kenneth D. McKellar and William D. Kyser, for appellant. Caruthers Ewing, for appellee.

Before SEVERENS and KNAPPEN, Circuit Judges, and DENISON, District Judge.

DENISON, District Judge. Brown, as complainant, filed a bill in the state court alleging that he owned and operated a coalyard adjacent to the railway tracks of the defendant, and having a side track running through his yard; that this side track had been constructed under an agreement between his predecessor in title and the railroad company that the latter would continue to operate the side track in aid of the coalyard business, and would receive and deliver cars thereon; that the railroad company was refusing to carry out this agreement, and was about to discontinue the service, and threatened to tear up and remove the track. He prayed and secured a preliminary injunction preventing the defendant from removing the track or discontinuing the switching service. The defendant removed the cause to the United States court and answered denying the existence of the alleged contract, and denying all the resulting obligations upon which complainant counted. The case eventually came on for final hearing

on pleadings and proofs, and the bill was dismissed, the court being of the opinion that the existence of any contract was not made out, and that the complainant, rather than the defendant, was at fault for the controversy which had arisen.

The complainant failed to offer any proof of the existence of the contract alleged or of any contract whatever between the railroad company and the complainant's predecessor or, except as hereinafter mentioned, between complainant and the railroad, upon the subject of the building, maintaining or operating of this side track. It was only made to appear that, when complainant bought the property, the track was there and in use, and that its use had been continued without question for a considerable period and until a trifling collateral controversy arose between the parties. Then it appeared that the railroad company claimed to own the rails and ties in this side track. Brown did not admit this claim, neither did he dispute it. He testifies that he knew nothing about it excepting that his grantor had claimed to have furnished either the grading or the rails. Brown was not sure which. The railroad company then prepared and requested Brown to sign a contract. The contract so presented is not in the record, but it is clear that it contained an admission that the rails and ties belonged to the railroad and granted the railroad company a right of way along this track that would permit the railroad to use it also for reaching some one beyond the limits of the yard. It is clear enough, also, that it was in other respects in the usual form of similar switching service contracts in the vicinity, and so was terminable on short notice by either party, and, so long as it should continue in force, bound the railroad company to give service and Brown to give the railroad all his traffic which it could handle with as good rates as any competitor.

It appears that there were, in that vicinity, connected with this railroad, nine other side tracks of the so-called industrial character. Three of these were upon ground belonging to the railroad company, and so do not stand upon wholly the same basis as the track in question. Of the six contracts regarding tracks laid on the premises of the shippers, it appears that all contained a provision for termination by either party on 60 days' notice, and some provision for indemnifying the railroad against certain damages, and five out of the six, a provision for right of way across the yard and for giving the railroad all traffic which it could handle at rates as low as any competitor. Brown testifies that during these negotiations several different contracts were presented, and that he refused to give the right of way, and refused to give that railroad the preference on his traffic. He does not now specify that he objected to other provisions. Under date of February 11, 1903, he stated his position:

"I beg to advise that I will, under no condition, execute deed covering right of way through my coalyard on Union street. If you can show that the rails and cross-ties now lying in this yard are the property of the Southern Railway Company, we will gladly give you permission to remove the same, you giving us ample time for us to get the rails and other material so that we can lay the track again at our own expense without interfering with our business."

During further negotiations, Brown persisted in his refusal to accept the contract which the railroad company offered, and finally, under date of August 11, 1903, but actually at a somewhat later date, Brown signed a paper which had been prepared by the railroad company, and which, omitting immaterial parts, is as follows:

"We, Robert L. Brown, F. H. Heiskell, and J. H. Weatherford, trustees, of Memphis, Tennessee, for and in consideration of the sum of one dollar to us in hand paid by Southern Railway Company, do hereby admit and declare that:

"Southern Railway Company, a corporation, etc., is the true and lawful owner of a certain industrial side track [describing the track in question].

"And we do further agree that Southern Railway Company, its successors and assigns, shall and may have the right to maintain and operate the side track upon the said premises of Robert L. Brown until the said Robert L. Brown, his heirs and assigns, shall serve upon the railway company sixty days' notice to remove the same; and upon the taking effect of such notice, the railway company shall have a reasonable time, not to exceed thirty days, to remove the rails and materials in said track from the said land of Robert L. Brown."

Heiskell and Weatherford were trustees under a mortgage or trust deed given by Brown, and their signatures were necessary to make Brown's release of claim to the track completely operative. Otherwise, their joinder in this offer had no bearing.

This paper was, in form, strictly an offer and agreement by the owners of the land. It did not purport to contain any affirmative agreement by the railroad company, was not drawn to be executed by the railroad company, and it was not, in fact, executed by the railroad company. It was, however, accepted by the railroad company, which so became bound by all conditions which were attached to the offer.

This contract is the only one shown by the proof. It is not the contract described in the complaint nor as to which issue was joined; but we prefer to consider complainant's alleged rights as they exist under this instrument without regard to any question of pleading. The railroad company then continued to give Brown such switching service as he requested, but it appears that he was shipping over the Southern Railroad nothing which could go by any other route, and that out of the maintenance and operation of this side track the railroad was receiving directly only switching charges, and indirectly, from longer hauls, little or no benefit. In 1904 the railroad company desired Brown to quitclaim a narrow strip along his yard which it claimed was part of its main track right of way. He refused. The railroad company then gave notice of its intention to remove the side track and discontinue switching service, and this litigation was precipitated.

It is complainant's present theory of the contract of August 11, 1903, that the words "that the Southern Railway Company shall and may have the right to maintain," etc., should be read "that the Southern Railway shall maintain and may have the right to maintain," etc., and that the acceptance by the railroad of this proposition charged it with the affirmative and perpetual duty of maintaining and operating the side track. We think the contract is not open to this construction, but rather that the phrase "shall and may have the right to main-

tain" is only a double method of expressing the same permission. This expression in the contract is, giving it the view most favorable to complainant, only ambiguous. The most that could be said for complainant would be that the language might be capable of the construction claimed.

We think the construction which we adopt is the more natural one from the words themselves. The words "shall" and "may" are often used in the alternative form, and so that the word "shall" expresses futurity only, and implies no idea of obligation. To interpret this phrase "shall and may have the right to maintain" as meaning "shall have the right to maintain and may have the right to maintain" is natural; while to interpret it with the other meaning, requires that the words ("and may have the right to") be made parenthetical and cut out from the position they occupy, so that the words "shall" and "maintain" are brought together. This seems to us rather a forced construction.

Further, this is, in form, a proposition from Brown, stating what he is willing to do, and what he agrees to do, and its language normally refers only to that subject. To suppose that it includes also an agreement by the railroad does violence to the form of the words. In such cases, when it is desired, independently to bind the grantee, it is customary to state that the grant is upon condition that the grantee shall accept certain obligations; and we are asked to interpret this mere grant of revocable permission as if it read:

"This declaration and consent are upon the condition that the railroad agrees to maintain and operate this track permanently."

Again, it would have been natural for Brown, if he had supposed he was getting a permanent agreement by the railroad company, to put the paper in shape to get its signature. He would not have been content to rest such a valuable right upon the uncertain effect of the parol acceptance of an ambiguous offer.

Further, there would be little, if any, consideration for an agreement by the railroad company to forego its usual conditions and to maintain unconditional, perpetual service. The company got nothing by the contract of August, 1903, excepting the formal release of any claim by Brown to the ties and rails, and the right to maintain the track as long as Brown was willing. He said, October 31, 1902, "it had never occurred to me who the track belonged to, nor did I care." He gave up nothing, excepting this claim of ownership which he never affirmatively had made. It is not reasonable to suppose that the railroad company was deliberately choosing not to demand from Brown those reciprocal obligations which it was getting from all others with whom it was definitely agreeing to furnish switching service, but to waive any duty on his part to furnish even one car a year. Still, again, the right granted was to continue at the will of Brown. It cannot lightly be supposed that the correlative duty said to be imposed was or might be perpetual.

On the whole, the circumstances and the language lead to the conclusion that after negotiations regarding a continuing, subsisting service contract, the parties gave up trying to reach a general agree-

ment, and contented themselves with fixing Brown's right to get rid of the track when not wanted. The decision of this court in the case of McKell v. C. & O. Ry. Co., 175 Fed. 321, 99 C. C. A. 109, and on rehearing, January 9, 1911, is pressed upon us as establishing the rule that a perpetual contract should be implied. We do not understand the rule of the McKell Case to be applicable to these facts. In that case the railroad company definitely agreed in writing to do a continuing act without time limitation, and it was held that this unlimited agreement would not be limited by construction, excepting as required by the subject-matter of the contract, viz., by the extent of the coal in existence on plaintiff's lands, and subject to transportation. The present case is rather within the principle of the decision of this court in Jones v. Newport News, etc., Co., 65 Fed. 736, 13 C. C. A. 95, holding that an agreement for indefinite maintenance of a switch track did not arise in the absence of an express agreement, and from the mere fact of its construction and maintenance for a time.

It is true that in the McKell Case we considered the possibly dangerous character of the structure involved in Jones v. Newport News Co., as having some force; and the opinion in the latter case shows that this fact was considered as one of the circumstances counting against the implication that there was a permanent contract. An equally forceful circumstance is found in the present case, since it clearly appears, as held by the district judge, that to give Brown this unlimited and unconditional service would be to enforce a discrimination in Brown's favor as against all other shippers similarly situated.

The decree of the court below dismissing the bill is affirmed, with costs.