PAYNE, Director General of Railroads, v. MOUNT FRANKLIN FUEL & FEED CO. (No. 1236.)

(Court of Civil Appeals of Texas. El Paso. Oct. 27, 1921. Rehearing Denied Nov. 17, 1921.)

1. Railroads 216—Spur track agreement held not terminable at railroad's will.

Spur track agreement with fuel company, fixing no period of time during which the switch or spur track was to be maintained, *held* to obligate the railway company to permanently operate the switch, with no right to discontinue its operation unless the public interest so required.

2. Assignments 20—Spur track agreement held assignable.

Agreement to construct and operate a spur track by a railroad company and a shipper, containing no provision as to assignability, was assignable under Vernon's Sayles' Ann. Civ. St. 1914, art. 583.

3. Railroads 216—Petition held sufficiently to allege loss from breach of spur track agreement.

In action for damages from change of spur track in violation of agreement, petition *held* sufficiently to allege damages from increase of expenses and loss of business.

4. Railroads 216—Damages from loss of profits held contemplated by parties to spur track agreement.

Spur track agreement with fuel company, reciting that the fuel company was conducting a general fuel business, and had purchased a tract adjacent to the railroad's right of way, etc., *held* to show that the parties contemplated that loss of profits to the fuel company would naturally result from the railroad's breach of the agreement.

5. Assignments 137—Evidence held to show assignment of spur track agreement.

In fuel company's action against railroad for change of spur track contrary to spur track agreement, evidence *held* to show assignment of the contract from plaintiff's predecessor to plaintiff, and that the railroad had notice thereof.

6. Railroads 216—Evidence held to warrant submission of issue of loss of profits from change of spur track.

In fuel company's action for damages from change of spur track, evidence *held* to warrant submission of issue of lost profits.

7. Damages 6—Certainty required is as to existence, not amount, of damages.

The rule that damages which are uncertain or contingent cannot be recovered does not embrace any uncertainty as to the value of the benefit or gain to be derived from the performance of the contract, but only the contingency as to whether such benefit would be derived at all; that is, the rule applies to only such damages as are not the certain result of the breach, and not to such as are the certain result, but uncertain in amount.

8. Evidence 460(5)—Railroads 216—Testimony by transferor of business that transfer included spur track agreement held proper.

In a fuel company's action against a railroad for change of spur track, contrary to spur track agreement, testimony of plaintiff fuel company's assignor that when he transferred the fuel business from himself to plaintiff on plaintiff's incorporation by transfer in terms of "all my right, title, and interest in said business," such transfer included the spur track agreement, *held* proper, as against the objection that it was immaterial, or that the transfer contract spoke for itself, or that the contract was one to which the railroad was not a party.

9. Railroads 216—Testimony as to loss of profits from breach of spur track agreement held not speculative.

In fuel company's action against railroad for change of spur track contrary to spur track agreement, permitting witness to state that the change of the switch made a big difference in plaintiff's business, and that plaintiff did not solicit business in carload lots of coal after the change because it could not handle it on a profitable basis, *held* proper, as against objection that the statement was speculative, and that such loss was not within the contemplation of the parties putting in the track.

### On Motion for Rehearing.

10. Railroads 216—Evidence as to necessity of double tracking properly excluded.

In fuel company's action against railroad for change of spur track contrary to spur track agreement, exclusion of evidence by the railroad as to necessity of double tracking at the point where the switch to the spur track was, was not error, there being no issue submitted or requested to be submitted as to danger from running trains against a facing switch, as alleged in the answer.

11. Railroads 216—Testimony as to loss of profits from breach of spur track agreement held proper.

In fuel company's action against railroad for change of spur track contrary to spur track agreement, it was not improper to permit a witness for plaintiff to say that it was not profitable, under the conditions witness found after the track was taken out and under the competition then existing, to handle coal in carload lots with a profit of $1 or $1.15 a ton.

Appeal from District Court, El Paso County; Ballard Coldwell, Judge.

Action by the Mount Franklin Fuel & Feed Company against John Barton Payne, Director General of Railroads, as Agent. Judgment for plaintiff, and defendant appeals. Affirmed.

Beall, Kemp & Nagle, of El Paso, for appellant.

C. M. Wilchar and Volney M. Brown, both of El Paso, for appellee.

For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**WALTHALL, J.** This suit was tried on the second amended original petition of appellee, Mount Franklin Fuel & Feed Company, against appellant, John Barton Payne, Director General of Railroads, as Agent, for damages alleged to have been occasioned by the alleged wrongful removal of a railway spur track, originally installed and operated by the Galveston, Harrisburg & San Antonio Railway Company adjoining appellee's fuel, feed, and plaster bins in the city of El Paso, and in alleged violation of a contract entered into between appellee and said railway company for the construction and operation of such spur track.

The damages prayed for are alleged to have been occasioned on account of extra expense entailed in unloading coal and plaster from cars on the switch as replaced, and for loss of business on account of the removal of the spur track.

Appellee, plaintiff below, alleged its business to be that of a general feed and fuel business, handled principally from cars set out upon a spur track that served the business of appellee and its predecessors in said business until the removal of said spur track by said Director General. Appellee alleged that its said business, together with its present location and facilities, including said spur track, were formerly owned and operated by the Santa Fé Fuel Company, a corporation, who in the year 1914 transferred and assigned said business, including said spur track, to James Connor, who succeeded to said rights and privileges theretofore enjoyed by the Santa Fé Fuel Company in and to said spur track, and who did business under the name of Mount Franklin Fuel & Feed Company; that Connor thereafter incorporated appellee, and is its principal stockholder, its manager, and president; that said railway on the day named entered into a written contract with its said predecessor, Santa Fé Fuel Company, with respect to said spur track.

The material portions of the contract set out in full in the petition are substantially as follows:

Its date is February 21, 1907; the contract is between the Galveston, Harrisburg & San Antonio Railway Company and the Santa Fé Fuel Company; the contract recites that the fuel company is conducting a general fuel and supply business in the city of El Paso, for which it had purchased a tract of land near the city and adjacent to the right of way of the railway company; that for the convenience and benefit of the fuel company it had directed that a railway spur track be constructed from a connection with the main track of the railway company, and so located as to extend along the south side of the tract of land purchased by the fuel company, describing it; that, in consideration of the covenants contained in the contract on the part of the fuel company to be by it kept and performed, the railway company agrees and binds itself "to contract (evidently meaning to construct) and operate the switch or spur track" to be located according to the map attached and made a part of the agreement. The conditions for the construction and operation of the spur track are, substantially:

(1) "The fuel company will furnish all necessary right of way for proper construction, maintenance and operation of the track as shown on the aforesaid map, title to which right of way shall be conveyed to the said railway company by good and sufficient deed so taken that the land will revert to the said fuel company, its successors or assigns, should the said track be taken up."

(2) "The fuel company will do all the necessary grading and prepare the roadbed ready for superstructure, this grading to be done and roadbed completed according to survey made by the resident engineer of the railway company or his representative."

(3) The railway company to pay the actual cost of material and labor required to put in the spur track, the total cost estimated at $887.10.

(4) The fuel company at its expense to keep the spur track in good repair as to material and labor.

(5) The fuel company to maintain a standard lamp on the switch stand of the switch track and have same lighted and cared for in accordance with the rules of the railway company, the railway company to furnish the light, oil, and wick necessary for the maintenance of the light.

(6) The spur track to be under the exclusive control of the railway company; the railway company to use the spur track as it may see fit; to extend same or connect with other tracks for the convenience of other patrons, provided such use does not interfere with the purpose for which the track is constructed.

(7) Provided that the fuel company is to be responsible for all cars put in the switch track in the event of destruction or damage by fire or other causes.

(8) Provides against the placing of material on or within 6 feet of the nearest rail of the track, and in the event of injury to employees, engines, etc., by reason of a failure to observe this provision, the fuel company to pay to the railway company all sums it is caused to pay on account of injuries, etc.

(9) Provides for the delivery by the fuel company to the railway company, or as it may direct all shipments the routing of which it does, or can, or may, control, etc. In the event of failure of the fuel company to comply with the terms of the contract, the railway company has the right, after 10 days' notice in writing to the fuel company of its intention so to do, to take up and remove the spur track, and the fuel company within 30 days to pay to the railway company all cost and expense incident to the removal, and in addition to pay $887.10, the estimated cost of the material and labor in putting in the spur track.

The contract was executed in duplicate by the railway company and by the Santa Fé Fuel Company.

(234 S.W.)

Appellee alleged the Santa Fé Fuel Company sold, transferred, and assigned its business located as above, with all rights, etc., including the above contract and the spur track to James Connor, who took said business and said contract over and observed the stipulations in said contract, and likewise said James Connor transferred and assigned said business with all rights and privileges, including the said contract and the spur track, to appellee, Mount Franklin Feed & Fuel Company, upon its incorporation, and that appellee observed the covenants and conditions of said contract; that the said railway company continued to recognize said assignees, and continued to operate and observe said contract at all times until the said railway company was taken over by the United States government; that the United States government operated the said railway through a Director General of Railroads until on or about March 1, 1920, and that John Barton Payne is the Director General; that the said Director General of Railroads operated and observed said contract until about the 15th day of June, 1918, at which time the Director General violated and breached said contract by taking up all of said spur track and replacing only a small part of same, leaving out about 80 feet of said spur track, and that along said distance appellee has its coal, fuel, and plaster bins, where it formerly unloaded and loaded directly from and into railroad cars all material shipped into or out of appellee's said place of business; that since said wrongful removal of said 80 feet of track appellee was compelled to carry in wagons and other conveyances all of said goods, wares, and merchandise to and from said cars, a distance of about 80 feet, to appellee's damage. Appellee alleged that said spur track was taken up and removed without notice to appellee; that appellant knew of said assignments from the Santa Fé Fuel Company.

Appellee pleaded that appellant was estopped to deny the validity of the assignments, or that said contract was in force and effect from the time the Director General took over the said railroad until same was turned back to the railroad company. Appellee alleges that it made protest to the Director General, who took out the said spur track, and that he, with actual knowledge of the damage to appellee, refused to replace same, and said spur track was not replaced. Appellee alleged that by reason of the taking up of said spur track it has been damaged in the cost of handling coal and plaster, stating the difference in the cost per ton of each, and the tons handled. Appellee further alleged that before the said spur track was removed it. enjoyed a large and lucrative business in dealing in said goods, wares, and merchandise, and would have continued to enjoy said business but for the acts complained of; that appellant for more than 20 months wrongfully deprived it of said spur track, and that, as a consequence directly flowing from said wrongful act, its business was curtailed, stating in detail the number of cars of products it could have handled, and its profits, but could not handle during said time on account of the extra expense in not having the spur track; that by reason of said extra expense it could not compete with its competitors in the same business. Appellee asked judgment for damages in the sum of $7,617.45.

The petition is lengthy, and we have not for that reason at all times followed its verbiage in stating the facts pleaded.

Appellant answered by general demurrer and special exceptions, general denial, and specially that it became necessary to place a double track at the place where the spur track was put in, so that all trains moving on said track so placed moved in a westerly direction, and all trains on the south or original track moved in an easterly direction; that to have let the switch remain as it was would have made it a facing switch on a one-way track, which would have increased the hazard, and it became necessary to change same and to face same in a different direction from the way in which it originally faced.

The case was tried with a jury, and submitted on special issues, resulting in a verdict and judgment in favor of appellee in the sum of $4,134.15.

The first assignment claims error in overruling the general demurrer. The second assignment complains of the overruling of the first special exception to the petition, in that it is not shown that the railway company, in putting in the switch track, nor the Director General, in operating the railroad, is required to maintain or keep said switch or spur track for any particular period of time.

The words used by the parties in stating the contract are: "The railway company agrees and binds itself to construct and operate the aforesaid switch or spur track"— stating its location according to a map referred to and designated lines thereon: then follow the conditions under which the railway company agrees to construct and operate said spur track. The only provision made in the contract with reference to the termination of the contract or removal of the spur track is found in the ninth paragraph, as stated above, and is conditioned on the failure of the fuel company to comply with the terms of the contract. Other than the above, neither the contract nor the petition states the time when the contract is to end, or when the spur track may be taken up. The spur track was put down in the year 1907, and was maintained and operated until June, 1918, when, without notice and over appellee's protest, it was taken up.

The sixth paragraph of the contract provides that the spur track shall be under the exclusive control of the railway company, but the contract does not otherwise, by its terms, extend the right of the railway company to change or remove the track.

The consideration stated in the contract is the covenants on the part of the fuel company to be by it kept and performed, and the petition states that all the covenants were kept and performed. The petition declares upon a breach of the contract, in that the Director General removed the spur track and replaced only a small part of said track, leaving out about 80 feet of same, and that damages were suffered by appellee by reason of the breach.

We are referred by appellant to a number of cases as sustaining its general demurrer and exceptions to the petition, among them: Texas & Pac. Ry. Co. v. City of Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385; Whalen v. B. & O. R. R. Co., 108 Md. 11, 69 Atl. 390, 17 L. R. A. (N. S.) 130, 129 Am. St. Rep. 423; Whalen v. B. & O. R. R. Co., 112 Md. 187, 76 Atl. 166; Barney v. Ry. Co., 157 Ind. 228, 61 N. E. 194; Mead v. Ballard, 74 U. S. (7 Wall.) 290, 19 L. Ed. 190; Jones v. Newport News & M. V. Co., 65 Fed. 736, 13 C. C. A. 95; Union Stock Yards Co. v. Nashville Packing Co., 140 Fed. 704, 72 C. C. A. 195.

Space forbids an extended review of each of the above cases. Some of the cases referred to are suits for specific performance of contracts to construct and maintain specified properties at specified places, and from the language used in the contracts the idea of perpetual or permanent maintenance is conveyed.

In the case of Railway v. Camp, 130 Ga. 1, 60 S. E. 177, 15 L. R. A. (N. S.) 594, 124 Am. St. Rep. 151, 14 Ann. Cas. 439, and referred to with approval by Chief Judge Fly in Mosel v. San Antonio & A. P. Ry. Co., 177 S. W. 1048, it was held that contracts, similar to the one under consideration, are valid and binding upon the company so long as it is possible for the company to discharge its duties incumbent upon it by the contract; but when the exigencies of the business of the company are such that the rights of the public come in conflict with the rights of the contracting party under his contract, it is to be presumed that it was the intention of the parties that the private rights under the contract should yield to the public right.

[1] We think it cannot be held as a matter of law, under the facts stated in the contract, that the contract was unenforceable for the reason solely that the contract did not state a period of time during which the spur track was to be maintained. Our interpretation of this contract is that it obligated the railway company to permanently operate the switch, and that it had no right to discontinue its operation unless the public interest so required. Considering the contract as a whole it negatives the idea that the switch was removable at the will of the railway company. The first and second assignments are overruled.

[2] The third assignment claims error in overruling the appellant's second special exception, the petition showing that there is no privity of contract between appellee and the railway company, or the Director General, and appellee acquired no right under or by virtue of any alleged contract or any act or thing set out in the petition.

The contract for the construction and operation of the switch track was alleged to be between the Santa Fé Fuel Company and the railway company. There was no provision in the contract as to its assignability by the Santa Fé Fuel Company, and no agreement alleged by which the railway company was to accept other parties in place of the Santa Fé Fuel Company.

Article 583, Vernon's Sayles' Texas Statutes, provides:

"The obligee, or assignee, of any written instrument not negotiable by the law merchant may transfer to another, by assignment all the interest he may have in the same."

The case of Lakeview Land Co. v. San Antonio Traction Co., 95 Tex. 252, 66 S. W. 766, fully discusses and settles the question presented in the assignment against appellant's contention. See, also, M., K. & T. Ry. Co. v. Carter, 95 Tex. 461, 68 S. W. 159, at page 166. The assignment is overruled.

[3, 4] Appellant's fourth assignment presents two propositions suggesting error to the overruling of appellant's fourth special exception to appellee's petition. The ground of the exception is that appellee seeks to recover damages for loss of business, and that no facts are alleged or shown authorizing a recovery in connection therewith. The propositions are to the effect: First, it has not shown from the contract or facts alleged any right to recover; second, the contract on its face shows no loss of profits in business were contemplated by the parties to the contract as a probable result of a removal or change of the spur track.

The damages recoverable, assuming a breach of the contract, would be such as are incidental to and caused by the breach, and may reasonably be supposed to have entered into the contemplation of the parties at the time of making the contract. The contract declared upon and set out in full in the petition recites that the fuel company is conducting a general fuel supply business, and has purchased a tract of land adjacent to appellant's right of way, and that, for the convenience and benefit of the fuel company it is desired that a railway spur track be constructed, etc., and so located as to extend along the south side of the said tract of land purchased by the fuel company. Then fol-

low the subsequent provisions of the contract as set out above. The petition set out in detail the number of tons of coal and plaster handled by appellee from appellant's cars, the cost of handling the coal and plaster per ton from the cars set on the switch, and the increased cost per ton in handling the coal and plaster by reason of the removal of the switch; it further alleged the loss of business on account of being compelled to pay an increased cost per ton in handling the material, and that its business was curtailed, and it lost the sale of the number of cars of material stated for lack of facilities in handling.

The damages claimed here are such, it seems to us, as would naturally be expected to follow as a result of the removal of the spur track. The recitation in the contract shows that the railway company and the Director General knew the character of appellee's business, the material it was handling, the advantage to appellee of having the spur track, and the disadvantage in not having the track; and, from the length of time the spur track was used by appellee and operated by the railway company and the Director General, the approximate number of cars of coal and plaster handled by appellee in a given period of time could have been known to appellant, if not actually known, and the number of cars of material appellee could handle without the track, as well as the method of handling the material made necessary by the removal of the spur track. We think it can be said that the parties to the contract could contemplate, from the contract and its subject-matter and the course of dealing under it, that the net receipts in handling the coal and plaster without the spur track would be less than they would be in handling the same with the spur track in and the cost placed thereon.

The fifth, sixth, seventh, eighth, ninth, and tenth assignments are directed to the refusal of the court to give an instructed verdict in favor of appellant. A number of additional propositions are submitted under the fifth assignment, some of which are presented under separate assignments.

[5] The third and fourth propositions under the fifth assignment assert that the evidence did not show a transfer or assignment from the Santa Fé Fuel Company to James Connor, nor an assignment from Connor to the Mount Franklin Fuel & Feed Company. The evidence, we think, shows a transfer and assignment of the entire business, including the contract in controversy here, from the Santa Fé Fuel Company to James Connor, and from Connor to appellee. The assignment from the Santa Fé Fuel Company to James Connor was lost. Fred Weckerle, who was manager of the Santa Fé Fuel Company, and for it executed the contract in question, was permitted to testify as to what was conveyed by his company to James Connor.

He said there was a written transfer. It stated the transfer of everything, embracing the business in East El Paso, known as their East Yard. He said "this transfer specified this contract and the trackage facilities there." By several propositions under this assignment it is asserted that there was no evidence that the railroad company ever knew or had notice of the assignment by the Santa Fé Fuel Company to Connor, no evidence that the railroad company recognized in appellee any rights or liabilities in connection with the switch track in question. The evidence shows that the Santa Fé Fuel Company sold the property and business including the contract in question to James Connor, on April 1, 1914, and that Connor personally owned and carried on the business in the name of Mount Franklin Feed & Fuel Company, using the switch track until the appellee was organized in 1917, and thereafter in the corporate name. The government took over the management of the properties of the railway company on December 28, 1917, and through its Director General operated the switch until June, 1918.

The evidence seems to us to fully advise the management of the railroad of the facts. The views we express in discussing a previous assignment apply to assignments from the sixth to the tenth, both inclusive.

[6] Assignments 11, 12, 13, 14, and 15 are directed to the giving of special issue No. 1. It reads:

"Question No. 1: (a) Was the plaintiff, during the time complained of, and prior to March 1, 1920, prevented from handling the commodities as described in its petition, and did it suffer loss of profit thereby by reason of the change in the side track described in its petition? Answer 'Yes' or 'No.' If you answer 'Yes,' then answer: (b) What was the amount of such loss?"

To subdivision (a) the jury answered "Yes." To (b) the jury answered, "$2,500."

It is claimed under these assignments that there was no evidence that plaintiff was prevented from handling its commodities prior to March 1, 1920, or suffered loss of profits by reason of the change in the side track, and that loss of profits is not an element of damage recoverable in this case. The evidence is too voluminous to quote here.

The evidence, we think, justified the submission of special charge. The evidence shows that during the time the first or old track was out the coal, fuel, and plaster bins were not served at all. Under the new track arrangement only one car was placed in at a time, and once in 24 hours. With the old trackage facilities five cars of merchandise were handled at one time from the cars into the storage bins. This could not be done with the track as replaced. After the first track was taken out, except as to one car, unloading of cars was done by

wagons from the cars to the bins. The evidence shows the increased cost per ton of unloading coal and plaster by wagons. The evidence shows the volume of business during the latter part of 1918, all of 1919, and up to March 1, 1920, as compared with the business immediately prior thereto, and the result of such comparison and the difference in the volume of business. The loss or falling off in the volume of business as shown by the evidence did not arise from trade conditions, but the evidence shows with reasonable certainty and without controversy in the proof offered that the loss was due solely to the lack of the facilities for handling the coal and plaster, and the increased cost made necessary for the same reason. Reasonable certainty as to the loss is all that is necessary. Springer v. Riley, 36 S. W. 577; Grand Prairie Gravel Co. v. Joe B. Wills Co. (Tex. Civ. App.) 188 S. W. 680.

[7] In Fraser v. Mining Co., 28 S. W. 715, Judge Neill held that, when it is certain that damages have been caused by a breach of contract, and the only uncertainty is the amount, there can rarely be a good reason for refusing, on account of such uncertainty, any damages whatever for the breach. The rule that damages which are uncertain or contingent cannot be recovered does not embrace any uncertainty as to the value of the benefit or gain to be derived from the performance of the contract, but only the contingency as to whether such benefit would be derived at all; that is, the rule applies to only such damages as are not the certain result of the breach, and not to such as are the certain result, but uncertain in the amount.

The issues presented by the sixteenth assignment, as to the assignability of the contract, and the sufficiency of the evidence to show that it was assigned, have been discussed under previous assignments.

The seventeenth assignment questions the sufficiency of the evidence to sustain the jury's finding in response to subdivision (a), question 4, to the effect that plaintiff's damage could not have been diminished by any ordinary diligence on the part of plaintiff. The finding, we think, has evidence to support it. We need not reproduce the evidence, nor discuss the issues presented under the two propositions. From the switch track constructed and operated under the contract, five cars could be and were placed at same time opposite, and unloaded into, appellee's bins. With the old switch track removed, and partially replaced by the new, only one car could be put in opposite the bins at a time in each 24 hours. It was necessary to unload all cars put on the siding in the 24 hours, in excess of the one car, by wagons. The evidence, we think, was sufficient to show the above facts, and to show the extra expense of handling the coal and plaster

by wagons. Appellant's proposition to the effect that appellee could have done business in carload lots as expeditiously and cheaply under the new arrangement as under the old, is not sustained by the evidence.

The matters presented under assignments 18 and 19 have been discussed under other assignments. We are inclined to the view that the letters complained of in assignments 20, 21, 22, and 23 were inadmissible under the rule of Hadley v. Baxendale, 9 Exch. 341, but under the facts of this case the error, if any, in admitting same was harmless. The recitations in the contract, the facts surrounding its original execution and existing at the date of its breach by the removal, were abundantly sufficient to charge the railway company with notice of the special damages which would result from its removal.

Furthermore, the case was tried upon special issues, and the letters did not relate to any issue of fact submitted to the jury. Therefore their findings could not have been affected by the letters. It will be assumed that the court found that the special damages were within the contemplation of the parties when the contract was executed, and that his finding was based upon the competent evidence before it.

[8] We think there was no error in permitting James Connor to testify over objection that, when he transferred the business from himself to appellee on its incorporation, everything was taken into consideration which witness controlled; that it did not make any difference whether it was trackage, wagons, or what; that it was a part of the business, and that what he conveyed appellee was the same as he enjoyed, and under the same conditions as he enjoyed. Those trackage facilities were the most valuable parts of the business or of as much value as any other part; they were a part of the method of conducting it, and it could not be done without it. The grounds of objection are that the evidence was immaterial, and not susceptible of explanation, and because the purported transfer from the Santa Fé Fuel Company to witness, and from witness to appellee, speak for themselves, are not ambiguous, are contracts to which the carrier was not a party.

Appellee had introduced in evidence the fifth clause of the assignment of James Connor, the witness, in which he conveyed to appellee—

"all of my right, title, and interest in and to all that certain stock of goods, wares, and merchandise situated (the business involved here), * * * and all of my right, title, and interest in said business," etc.

We think it was not immaterial. While the clause of the contract introduced showed a transfer, it could not be harmful for the witness also to state that the things em-

braced in the article of transfer were transferred. The clause of the contract introduced in evidence includes all of Connor's right, title, and interest in the business. We think he could be permitted to say just what that right and interest in the business included. The articles of merchandise conveyed are stated in the clause of the contract. What right and interest in the business was also conveyed is not specified in the clause of the contract. In conducting the business Connor had enjoyed the switch track facility. The track facility was not specifically stated in the transfer. The switch track contract had been assigned to him, and we think he could say that same was by him included in his assignment to appellee as a right, interest, and part of the business. It was necessary that appellee show that it owned the business. It was not necessary that the railway company, or the Director General, should be a party to the conveyance of Connor's to appellee to admit the contract in evidence.

The twenty-fifth assignment claims error in refusing to permit appellant to elicit from James Connor the necessity of double tracking the railroad at the point of the switch track. Appellant's answer alleged that it was necessary at the place in question to double track the line of the road so that all trains moving on the north track would move in a westerly direction, and to allow the switch to remain as it originally was would necessitate all trains being run against a facing switch point which appellant alleged was dangerous, and for that reason the change in the spur track was made.

The question revolves around the danger feature to the public safety. Unless it be made to appear that it was dangerous to run the trains against the facing switch track, as alleged, we think it would be immaterial to show the necessity to double the road track at the place of the switch, C. R. Merrill, who was superintendent of the railway company at the time of the trial, and was also superintendent on March 1, 1920, testified that—

"It was not dangerous from a standpoint of public policy to have placed that switch in from the east. It would have been more dangerous to have placed it in from the west."

We are not advised by the brief nor elsewhere, except by the allegation in the answer that appellant expected to show that the switch track would have created a dangerous condition in the double track. As the record appears, we think no reversible error is shown. The record does not show that the witness Powers answered the question submitted as complained of in assignment 26. The question was reframed, and as reframed, was answered. The assignment does not complain of the question as answered.

[9] Assignment 27 claims reversible error in permitting the witness Powers to state, over objections, that the change of the switch in June, 1918, made a big difference in appellee's business. That appellee did not solicit business in carload lots of coal after said change in the switch because it could not handle it on a basis to make any money. The objection was that the statement was speculative, was not within the contemplation of the parties, not covered by the contract; that during a large part of the time the country was at war, and conditions not what they were prior to the war; embargoes were placed on various products; the Fuel Administration controlled the fuel, and there were restrictions on building, so no buildings were erected, and that it would be impossible to form a legitimate conclusion as to whether or not there was loss of business that was caused by anything alleged in the petition; same was impossible of ascertainment, and was a conclusion of the witness. An examination of the record discloses that the facts upon which some of the objections to the statement of the witness are based are assumed, rather than shown.

The record shows that the demand for coal and plaster in El Paso from July 1, 1918, to March 1, 1920, was good; that the war had no local effect on the demand for coal. Appellee handled all the retail business it could secure. The limited trackage facilities affected the wholesale business. Appellee did not have facilities for handling cars in large quantities after the track was removed. The witness was familiar with the conditions as to the demand for the commodities handled by appellee, the cost of handling with and without the spur track, and the effect the removal of the track had upon the business. We think his statement was not speculative, was within the contemplation of the parties in putting in track.

What we have said in discussing assignment 27 applies to 28.

After a careful review of the entire record we have concluded that no reversible error is shown, and the case is affirmed.

### On Motion for Rehearing.

[10] In discussing the twenty-fifth assignment, and after quoting a part of the evidence of the witness Morrill, to the effect that the facing switch track did not create a dangerous condition, we said that:

"We are not advised by brief nor elsewhere, except by the allegation in the answer, that appellant expected to show that the switch track would have created a dangerous condition in the double track."

The quoted statement is not altogether justified by the record, as insisted by appellant in the motion, as the record discloses

that another witness testified in effect that the change in the switch was made necessary to eliminate the danger of the facing switch against the current of traffic. The error assigned was the refusal of the court to permit the witness Connor to testify as to whether the double tracking at the place of the switch was to expedite business. What we should have said, if anything, was that the issue of danger of the facing switch track was not submitted as an issue in the case, nor was the issue of danger from the facing switch requested to be submitted, though evidence pro and con on the issue of danger from the facing switch was offered. While the necessity for putting in the double track and the purpose of it was a provable issue, it was not a material issue. As said in the opinion, the danger feature to the public by reason of the facing switch was the material issue, and the purpose of stating briefly the evidence of the witness Morrill, though not necessary to state it, was to show that the judgment of the court on the issue made by the pleading, though not submitted, was sustained by the evidence.

[11] The only other feature of the motion we care to discuss is the comment in the opinion on assignment 26. We said that the appellant did not complain of the question to the witness Powers as reframed and answered. Appellant insists in the motion that his objection went to the question and answer as reframed. With appellant's construction of the objection, the question to Powers found in appellant's statement under the assignment was:

"Now, assuming that profit was cut down to $1.15 or $1 a ton, state whether or not it would be profitable to handle coal."

The question, as reframed, was:

"Now, Mr. Powers, under those conditions you found after the track had been taken out, under the competition that then existed, state whether or not it was profitable to handle coal in carload lots."

To the question as reframed the witness answered:

"It was not."

The objection was:

"That if a man made $1 a ton profit, to permit him to state whether or not it was profitable to handle coal would be permitting the witness before the jury to say he didn't do business because he didn't make a big profit as otherwise, when his own evidence shows that plaintiff is making a good profit, a working, living profit."

Assuming that the above objection went to the question as reframed and answered, the question presented here is: Should the witness have been permitted to say that it was not profitable under the conditions wit-ness found after the track was taken out, and under the competition then existing, to handle coal in carload lots with a profit of $1 or $1.15 per ton.

The issue was sufficiently made in the pleading, and, thus tendered, was a provable one. It was not questioned that Powers was not qualified to answer the question. It seems to us that the question to Powers was not open to the objection made.

We have concluded that the motion should be overruled.